The summaries of the Colorado Court of Appeals published opinions constitute no part of the opinion of the division but have been prepared by the division for the convenience of the reader. The summaries may not be cited or relied upon as they are not the official language of the division. Any discrepancy between the language in the summary and in the opinion should be resolved in favor of the language in the opinion.

SUMMARY
February 11, 2021

## 2021COA15

**No. 19CA1108, *State Farm Mutual Automobile Insurance Company v. Gary J. Griggs and Susan Goddard* — Insurance — Automobile Insurance Policies — Breach of Contract; Torts — Bad Faith Breach of Insurance Contract**

In this insurance bad faith case, a division of the court of appeals considers whether the district court erred by (1) denying a motion for a directed verdict on the insurer's claim for breach of contract against its insured; (2) denying a motion for a directed verdict on the insurer's affirmative defense of collusion; and (3) admitting irrelevant and prejudicial evidence at trial.

The division refuses to adopt a blanket rule that an insured cannot, as a matter of law, breach an insurance policy by entering into an agreement like the one contemplated by the Colorado Supreme Court in *Nunn v. Mid-Century Insurance Co.*, 244 P.3d 116 (Colo. 2010). Instead, the division holds that, before an insured is

justified in stipulating to a judgment and assigning its claims against its insurer to a third-party claimant, it must first appear that the insurer has unreasonably refused to defend the insured or to settle the claim within policy limits. Whether an insurer appears to have acted unreasonably and whether an insured has breached an insurance contract by entering into such an agreement are questions of fact.

The division also concludes that any error by the district court in allowing the jury to consider the insurer's collusion affirmative defense was harmless because the jury found that the bad faith claim failed on its elements and never reached the merits of the defense. Finally, the division concludes the district court did not erroneously admit irrelevant or prejudicial evidence.

For these reasons, the division affirms the judgment.

COLORADO COURT OF APPEALS                                    **2021COA15**

---

Court of Appeals No. 19CA1108
City and County of Broomfield District Court No. 16CV30175
Honorable Emily E. Anderson, Judge

---

State Farm Mutual Automobile Insurance Company,

Plaintiff-Appellee,

v.

Susan A. Goddard,

Defendant-Appellant.

---

JUDGMENT AFFIRMED

Division VI
Opinion by JUDGE BROWN
Bernard, C.J and Vogt*, J., concur

Announced February 11, 2021

---

Spencer Fane LLP, Evan Stephenson, Kayla Leigh Scroggins-Uptigrove, Denver, Colorado, for Plaintiff-Appellee

Franklin D. Azar & Associates, P.C., Natalie A. Brown, DezaRae D. LaCrue, Elisabeth Owen, Aurora, Colorado, for Defendant-Appellant


*Sitting by assignment of the Chief Justice under provisions of Colo. Const. art. VI, § 5(3), and § 24-51-1105, C.R.S. 2020.

¶ 1     This insurance bad faith case requires us to explore the circumstances under which an insured may protect itself from an insurer's apparent bad faith conduct — by stipulating to a judgment and assigning its claims against its insurer to a third-party claimant — without breaching its insurance contract.

¶ 2     State Farm Mutual Automobile Insurance Company (State Farm) sued its insured, Gary J. Griggs, seeking a declaration that Griggs breached his insurance contract by, among other things, entering into an agreement with third-party claimant Susan Goddard, whereby Griggs stipulated to entry of a judgment against him in an amount to be determined by binding arbitration and assigned to Goddard any claims he had against State Farm. Goddard, as Griggs's assignee, brought a bad faith counterclaim against State Farm.

¶ 3     Goddard contends that the district court erred by allowing the jury to consider the breach of contract claim because it was required to determine as a matter of law whether Griggs's conduct violated the insurance policy. And she argues that Griggs could not have violated the insurance policy by entering into the agreement because his conduct was expressly authorized by the Colorado

1

Supreme Court in *Nunn v. Mid-Century Insurance Co.*, 244 P.3d 116 (Colo. 2010).

¶ 4 We reject Goddard's contention. Before an insured is justified in stipulating to a judgment and assigning its claims against its insurer to a third-party claimant, it must first appear that the insurer has unreasonably refused to defend the insured or to settle the claim within policy limits. And whether an insurer appears to have acted unreasonably is a question of fact. Thus, whether an insured has breached an insurance contract by entering into such an agreement is, like any other alleged breach of contract, a question for the fact finder.

¶ 5 Because we also reject the balance of Goddard's contentions on appeal, we affirm the district court's entry of judgment on a jury verdict in favor of State Farm.

## I. Background

¶ 6 State Farm insured Griggs under an auto insurance policy (the policy) with liability limits for bodily injury of $25,000 per person and $50,000 per accident.

¶ 7　　On November 30, 2013, Griggs injured Goddard and two other persons in a four-vehicle accident.  Goddard and the other two injured persons each made a claim under the policy.

¶ 8　　On December 16, 2013, Goddard retained Franklin D. Azar & Associates, P.C. (the Azar firm) as her counsel under a written contingent-fee agreement (the Azar fee agreement).

¶ 9　　On March 5, 2014, the Azar firm sent State Farm a settlement demand letter seeking to resolve Goddard's claim for the $25,000 policy limit.  The letter claimed that Goddard had incurred $2,410.00 in documented medical expenses; that records reflecting the charges she incurred at the hospital remained pending; and that she missed two days of work for a total wage loss of $141.60. The letter did not claim that Goddard would continue to incur medical expenses or suffer future damages.  The letter further provided as follows:

> We hereby demand your insured's policy limits and Ms. Goddard will settle for policy limits if offered to us by 5 p.m. on April 4, 2014.  If not offered by that date and time, then consider our offer to be automatically withdrawn at the expiration of that time period.  Our offer is conditioned on you providing proof of your insured's policy limits for all coverages available to Ms. Goddard for this claim, as well

as the underinsured motorist carrier granting permission to settle for the underlying liability limits.

¶ 10     On April 4, 2014, the date Goddard's settlement offer expired, State Farm offered $5,000 to settle her claim based on the documentation she had provided by that date. According to State Farm, Goddard never responded to the offer.

¶ 11     Approximately two months later, Goddard provided State Farm with additional medical records, including emergency room and physical and massage therapy records. The records indicated that Goddard had an MRI on April 8, 2014, and thereafter received a referral for a neurological evaluation and psychotherapy.

¶ 12     As of February 2015, after State Farm had settled with the two other injured persons, only $18,500 remained under the policy's per accident limit. State Farm offered Goddard the remaining $18,500 to settle her claim. Goddard did not respond.

¶ 13     Meanwhile, Goddard had sued Griggs on November 11, 2014. Goddard did not serve Griggs with the complaint and State Farm did not learn of the lawsuit until mid-March 2015, after the $18,500 settlement offer had been made. State Farm hired an attorney to defend Griggs against Goddard's claims.

¶ 14  In June 2015, Goddard informed Griggs's attorney that she was "no longer willing to accept a settlement offer within policy limits" and, "[i]n the interest of protecting [Griggs] from an excess verdict," offered him the opportunity to enter into an agreement whereby Griggs would assign "his rights to any potential bad faith claim against State Farm" to Goddard and, in exchange, Goddard would agree "not to pursue [Griggs's] personal assets."

¶ 15  In January 2016, the trial court granted Goddard leave to add a claim for punitive damages against Griggs because he admitted to driving under the influence of alcohol when he ran a red light and caused the accident that injured Goddard.

¶ 16  In June 2016, Griggs and Goddard entered into the agreement Goddard had proposed a year earlier (the assignment agreement). Under the assignment agreement, Griggs admitted liability for the accident and agreed to have Goddard's damages determined through a binding, nonappealable arbitration conducted by a specific arbitrator; to have judgment entered against him in the amount determined by the arbitrator; and to assign any claims he may have against State Farm to Goddard. In exchange, Goddard agreed to initiate any "necessary proceedings" against State Farm,

5

including pursing claims for breach of contract and bad faith, and not to execute on or enforce the judgment that would be entered against Griggs. Griggs further agreed to cooperate with Goddard in prosecuting any claims against State Farm.

¶ 17 Goddard and Griggs arbitrated the amount of Goddard's damages. State Farm paid counsel to defend Griggs at the arbitration. The arbitrator entered an award in favor of Goddard in the amount of $837,193.36. As contemplated by the assignment agreement, judgment entered against Griggs in that amount.

¶ 18 After arbitration, State Farm initiated the underlying declaratory judgment action against Griggs and Goddard, as Griggs's assignee, seeking a determination that Griggs breached the insurance policy by, among other things, entering into the assignment agreement with Goddard. Griggs disclaimed any interest in the litigation. Goddard counterclaimed that State Farm had breached the insurance policy and engaged in bad faith by, among other things, failing to settle Goddard's claims within the policy limits. State Farm asserted various affirmative defenses to Goddard's counterclaim, including, as relevant here, that the

arbitration award and the resulting judgment were unreasonable and the product of fraud and collusion.

¶ 19 Ultimately, the case proceeded to a six-day jury trial and the jury returned a verdict in favor of State Farm. First, the jury found by a preponderance of the evidence that State Farm proved its claim for breach of contract against Griggs. Second, the jury found by a preponderance of the evidence that Goddard had not proved her counterclaim for bad faith breach of insurance contract against State Farm. The jury did not reach the merits of State Farm's affirmative defenses.

## II.    Discussion

¶ 20 Goddard contends that the district court erred by (1) denying her motion for a directed verdict on State Farm's breach of contract claim; (2) denying her motion for a directed verdict on State Farm's collusion affirmative defense; and (3) admitting irrelevant and prejudicial evidence at trial. We affirm.

### A.    The District Court Did Not Err by Allowing the Jury to Consider State Farm's Breach of Contract Claim

¶ 21 Goddard contends that the district court erred by denying her motion for directed verdict on State Farm's breach of contract claim

because the claim (1) raised exclusively legal questions the court should have resolved and (2) failed on the facts. We disagree.[1]

### 1. Additional Background

¶ 22 At the close of State Farm's evidence, Goddard moved for a directed verdict on the breach of contract claim pursuant to C.R.C.P. 50, asking the district court to resolve the claim as a matter of law rather than submit it to the jury. Among other things, Goddard argued that Griggs's conduct — entering into the assignment agreement — was legally authorized by *Nunn*, and could not, as a matter of law, amount to a breach of the insurance contract. She also argued that State Farm's breach of contract claim failed for want of evidence because nothing Griggs did breached a policy provision.

¶ 23 State Farm countered that *Nunn* did not hold that an insured can *never* breach an insurance contract by entering into a stipulated judgment and assigning its claims to a third-party

---

[1] Although Goddard frames this issue on appeal as an error by the district court in "instructing the jury" to decide State Farm's breach of contract claim, she identifies no error in the jury instructions. Instead, she argues that the district court should have resolved the breach of contract claim as a matter of law by granting a directed verdict in her favor under C.R.C.P. 50.

claimant; instead, there must be a showing that the insurer acted unreasonably, engaged in bad faith, or gave its consent to such an agreement before the stipulated judgment can be enforced against the insurer.

¶ 24  The district court denied Goddard's motion, highlighting a series of disputed facts regarding Griggs's compliance with the policy provisions and the reasonableness of State Farm's conduct. The court noted that the jury was capable of reading the contract terms and, based on the evidence and testimony of both lay and expert witnesses, deciding whether there had been a breach.

### 2. Standard of Review

¶ 25  C.R.C.P. 50 authorizes a party to move for a directed verdict at the close of the evidence offered by the opposing party. Directed verdicts are not favored. *Flores v. Am. Pharm. Servs., Inc.*, 994 P.2d 455, 457 (Colo. App. 1999). Indeed, a motion for directed verdict may be granted only if the evidence, considered in the light most favorable to the nonmoving party, "compels the conclusion that reasonable persons could not disagree and that no evidence, or legitimate inference therefrom, has been presented upon which a jury's verdict against the moving party could be sustained."

*Burgess v. Mid-Century Ins. Co.*, 841 P.2d 325, 328 (Colo. App. 1992). "A motion for a directed verdict should be granted only in the clearest of cases." *Devenyns v. Hartig*, 983 P.2d 63, 70 (Colo. App. 1998).

¶ 26 We review a district court's decision on a motion for directed verdict de novo. *Bonidy v. Vail Valley Ctr. for Aesthetic Dentistry, P.C.,* 186 P.3d 80, 82-83 (Colo. App. 2008). We must determine whether there is evidence of sufficient probative force to support the district court's ruling. *Flores,* 994 P.2d at 457. Like the district court, we must consider all the facts in the light most favorable to the nonmoving party and determine whether a reasonable jury could have found in favor of the nonmoving party. *Id.*

### 3. Analysis

#### a. Whether Griggs Breached the Policy by Entering into the Assignment Agreement Was a Question of Fact to be Determined by the Jury

¶ 27 Goddard first contends that the district court erred by denying her motion for directed verdict on State Farm's breach of contract claim because the court was obligated to resolve as a matter of law "whether Griggs'[s] settlement of Goddard's claims against him by *Nunn* agreement breached the terms of the [p]olicy." She argues

that Griggs could not have breached the policy by entering into the assignment agreement because his conduct was expressly authorized by the Colorado Supreme Court in *Nunn.* She essentially asks us to adopt a rule that would immunize an insured against a claim for breach of contract any time the insured enters into an agreement like the one contemplated in *Nunn.* We decline to adopt such a blanket rule.

¶ 28    While the interpretation of a written contract is a question of law to be determined by the court, whether there has been a breach of contract is a question of fact to be determined by the jury. *Lake Durango Water Co. v. Pub. Utils. Comm'n*, 67 P.3d 12, 21 (Colo. 2003); *Town of Breckenridge v. Golforce, Inc.*, 851 P.2d 214, 216 (Colo. App. 1992). As a result, unless the evidence was undisputed and compelled the conclusion that no reasonable jury could find that Griggs breached the policy, the district court correctly denied the C.R.C.P. 50 motion. *See Burgess*, 841 P.2d at 328.

¶ 29    Every contract in Colorado contains an implied duty of good faith and fair dealing. *Nunn*, 244 P.3d at 119. "A violation of the duty of good faith and fair dealing gives rise to a claim for breach of contract." *City of Golden v. Parker*, 138 P.3d 285, 292 (Colo. 2006).

Due to the "special nature of the insurance contract and the relationship which exists between the insurer and the insured," however, it is now well settled that, in addition to contractual remedies for breach of an insurance contract, an insurer's bad faith breach of contract also gives rise to tort liability. *Nunn*, 244 P.3d at 119 (citation omitted); *Travelers Prop. Cas. Co. v. Stresscon Corp.*, 2016 CO 22M, ¶ 16.

¶ 30    Typically, the insured is responsible for paying any damages that exceed the amount of liability coverage purchased, yet the insurer retains exclusive control over the defense and settlement of claims. *Nunn*, 244 P.3d at 119. Thus, the insurer's covenant of good faith and fair dealing includes the duty to act reasonably in investigating, defending, or settling a third-party claim. *Id.*; *Goodson v. Am. Standard Ins. Co.*, 89 P.3d 409, 414 (Colo. 2004) ("Third-party bad faith arises when an insurance company acts unreasonably in investigating, defending, or settling a claim brought by a third person against its insured under a liability policy."); *see also* 14A Steven Plitt et al., Couch on Insurance 3d § 203:13, Westlaw (database updated June 2020) (Because an insurer has exclusive control over settlement of claims, it has a

12

duty "to settle within policy limits where recovery in excess of those limits is substantially likely, in order to protect the insured from a gamble by the insurer on which only the insured could lose.").

¶ 31    The insurer's duty of good faith and fair dealing extends only to its insured, not to a third-party claimant.  *Nunn*, 244 P.3d at 119.  But in Colorado,

> an insured . . . is also given wide latitude to protect itself from exposure to liability beyond the limits of its insurance coverage by assigning to the third-party claimant any claim it may have against its insurer for breach of the insurer's duty of good faith and fair dealing.

*Stresscon Corp.*, ¶ 17.

¶ 32    As is relevant here, the Colorado Supreme Court in *Nunn* approved of one way for an insured to protect itself from the risk of personal liability caused by its insurer's bad faith refusal of a policy-limits settlement offer.  *Nunn*, 244 P.3d at 119.  Nunn sued the insured for injuries arising from an automobile accident.  *Id.* at 118.  Before trial, Nunn and the insured entered into an agreement whereby the insured agreed to pay over to Nunn the insurance policy limit, to stipulate to a judgment against him in excess of that limit, and to assign any claims he had against his insurer to Nunn.

13

*Id.* In exchange, Nunn covenanted not to execute on the stipulated judgment. *Id.* Nunn, as the insured's assignee, then brought an action against the insurer, contending that it had breached the insurance contract and engaged in bad faith by failing to settle with Nunn within the policy limits, thereby exposing its insured to a judgment in excess of policy limits. *Id.*

¶ 33 The supreme court rejected the insurer's argument that, because Nunn had covenanted not to execute on the excess judgment against the insured, the insured had suffered no actual damages to maintain an action for bad faith. *Id.* at 121-22. Instead, it concluded that an insured who has "suffered a judgment in excess of policy limits, even if the judgment is confessed and the insured is protected by a covenant not to execute, has suffered actual damages and will be permitted to maintain an action against its insurer for bad faith breach of the duty to settle." *Id.* at 122.

¶ 34 Goddard contends that Griggs's assignment agreement is similar to the one in *Nunn* and that Griggs cannot, as a matter of law, breach the policy by following a procedure the Colorado Supreme Court has expressly authorized. But we do not read *Nunn* as immunizing an insured against a claim for breach of contract. It

14

does not appear that the insurer in *Nunn* argued that its insured breached the insurance contract by entering into the agreement with Nunn. Indeed, it would have been difficult for the insurer to make such an argument given that it granted its insured permission to enter into the agreement. *See id.* at 118 n.2. Instead, the court in *Nunn* focused solely on "whether a pretrial stipulated judgment coupled with a covenant not to execute can serve as the basis for a claim of damages in an action for bad faith breach of an insurance contract." *Id.* at 118.

¶ 35 Still, we find *Nunn* instructive because there the court explained that an insured may undertake the protective steps of stipulating to its own liability and assigning its claims against its insurer to a third-party claimant in exchange for a covenant not to execute on a judgment "when it appears that the insurer — who has exclusive control over the defense and settlement of claims pursuant to the insurance contract — has acted unreasonably by refusing to defend its insured or refusing a settlement offer that would avoid any possibility of excess liability for its insured." *Id.* at 119.

¶ 36    In other words, before an insured is justified in stipulating to a judgment and assigning its claims against the insurer to a third-party claimant, it must first appear that the insurer has unreasonably refused to defend the insured or to settle the claim within policy limits. And, whether an insurer acted — or *appeared* to act — unreasonably in denying a defense or a policy-limits settlement offer is a question of fact. *See Farmers Grp., Inc. v. Trimble*, 691 P.2d 1138, 1142 (Colo. 1984) ("The relevant inquiry is whether the facts pleaded show the absence of any reasonable basis for denying the claim, 'i.e., would a reasonable insurer under the circumstances have denied or delayed payment of the claim under the facts and circumstances.'" (quoting *Anderson v. Cont'l Ins. Co.*, 271 N.W.2d 368, 377 (Wis. 1978))); *Surdyka v. DeWitt*, 784 P.2d 819, 822 (Colo. App. 1989) ("The question of whether an insurer has breached its duties of good faith and fair dealing with its insured is one of reasonableness under the circumstances."). Thus, we reject Goddard's contention that an insured may *never* breach an insurance contract by entering into an agreement like the one contemplated by *Nunn*.

¶ 37    To the extent State Farm encourages us to hold that there must be a finding of bad faith on the part of the insurer before an insured is justified in entering into a *Nunn*-like agreement, we decline that invitation as well.  That rule is too harsh.  It places too much risk on an insured that has no control over the settlement of the claim and yet finds itself in the precarious position of trying to avoid breaching the insurance policy, thereby forfeiting coverage, and protecting itself from excess liability that may result from the insurer's inept claim handling.  Although *Nunn* requires a finding of bad faith before a stipulated judgment may be enforced against the insurer as the measure of damages for a bad faith claim, *Nunn*, 244 P.3d at 120 ("[W]e have held that a pretrial stipulated judgment cannot be enforced against an insurer in the absence of a determination of bad faith . . . ."), whether an insured has breached an insurance contract is a different question.  Based on the language in *Nunn*, an insured is justified in entering into a stipulated judgment and assignment agreement without breaching the insurance contract when it *appears* that the insurer has acted unreasonably.  *See id.* at 119.

17

¶ 38    Although a finding that the insurer appeared to act unreasonably — thereby allowing an insured to enter into a *Nunn* agreement — and a finding that the insurer actually acted unreasonably — resulting in a finding of bad faith on the part of the insurer — are likely to go hand in hand, it is conceivable that an insurer may *appear* to have acted unreasonably in rejecting a policy-limits offer, but not actually acted unreasonably in settling the claim.  Under that scenario, the insured would not have breached the insurance contract and the insurer would not have acted in bad faith.

¶ 39    Here, the fact that Griggs entered into the agreement with Goddard was undisputed.  But Griggs would have been authorized to enter into the assignment agreement without breaching the insurance policy only if it *appeared* that State Farm had acted unreasonably by refusing Goddard's offer to settle within policy limits.

¶ 40    The apparent reasonableness of State Farm's conduct was hotly contested at trial.  And State Farm offered at least some evidence that its rejection of Goddard's policy-limits settlement offer appeared reasonable, including the following:

- On March 5, 2014, Goddard made a settlement demand for the full $25,000 policy limit. The demand letter claimed that Goddard had incurred $2,410.00 in documented medical expenses and $141.60 in wage loss. It indicated that other records remained pending but did not claim that Goddard would continue to incur medical expenses or suffer future damages. It stated that the offer would expire on April 4, 2014.

- On the offer expiration date, based on the documentation that had been provided, State Farm offered $5,000 to settle Goddard's claim.

- Two months later, Goddard provided State Farm with additional medical records, which indicated that Goddard had received a referral for a neurological evaluation and psychotherapy. Goddard also provided State Farm with a Boulder radiologist bill that had been written off and partly predated the November 30, 2013, accident. The bill was for a January 23, 2013, chest x-ray and December 2, 2013, neck and spine exam.

- Around February 2015, State Farm asked Goddard for an update on her status. Goddard did not respond. State Farm nonetheless offered Goddard $18,500, which was the balance of the policy limits remaining after it settled with the two other claimants. Goddard did not respond.

- In June 2015, Goddard informed Griggs's attorney that she would no longer accept a settlement within the policy limits.

- Although Goddard had a neurosurgical evaluation in May 2014, she did not inform State Farm of the surgical recommendation resulting from that evaluation until September 2015, approximately ten months after she sued Griggs and seven months after State Farm offered her the remaining policy limits.

¶ 41    Considering these disputed facts, we conclude that whether State Farm appeared to have acted unreasonably in denying Goddard's policy-limits settlement offer and, consequently, whether Griggs breached the insurance contract by entering into the assignment agreement were questions of fact to be determined by the jury. Accordingly, we conclude that the district court did not

err by declining to hold, as a matter of law, that Griggs did not breach the policy by entering into the assignment agreement.

### b. A Reasonable Jury Could (and Did) Find in Favor of State Farm on Its Breach of Contract Claim

¶ 42 Goddard next contends that the district court erred by denying her motion for directed verdict on State Farm's breach of contract claim because the undisputed facts established that Griggs did not breach the policy.[2] We disagree.

¶ 43 Goddard first asserts that State Farm had already breached the policy's implied covenant of good faith and fair dealing by the time Griggs entered into the assignment agreement. Under such circumstances, she argues, the assignment agreement "cannot, as a matter of law, constitute a breach of the policy's terms." But Goddard's argument presupposes State Farm breached the policy first. And whether State Farm breached the policy at all (or, as discussed above, whether it *appeared* to have acted unreasonably

---

[2] We have already rejected Goddard's argument that the district court should have ruled as a matter of law that an insured can never breach an insurance contract by entering into an agreement similar to the one in *Nunn.* But Goddard also contends, as a matter of fact, that Griggs did not breach any provision of the policy by entering into the assignment agreement.

in denying Goddard's initial settlement demand) was a vigorously disputed factual issue that the jury ultimately resolved in State Farm's favor.

¶ 44    Goddard also asserts that the facts did not establish that Griggs breached any policy provision.  Under the policy's insuring agreement, State Farm had the right to

> a.    investigate, negotiate, and settle any claim or lawsuit;
>
> b.    defend [Griggs] in any claim or lawsuit, with attorneys chosen by [State Farm]; and
>
> c.    appeal any award or legal decision for damages payable under this policy's Liability Coverage.

Under the policy exclusions, there was no coverage "FOR LIABILITY ASSUMED UNDER ANY CONTRACT OR AGREEMENT."  And under the insured's duty to cooperate, Griggs agreed to the following:

> d.    [Griggs] must cooperate with [State Farm] and, when asked, assist [State Farm] in:
> (1)    making settlements;
> (2)    securing and giving evidence; and
> (3)    attending, and getting witness to attend, depositions, hearings, and trials.
>
> e.    [Griggs] must not, except at his . . . own cost, voluntarily:
> (1)    make any payment to others; or

                    (2)     assume any obligation to others
                            unless authorized by the terms of
                            this policy.[3]

¶ 45    In general, an insured breaches the cooperation clause of his

insurance policy when he "fails to cooperate with the insurer in

some material and substantial respect and the failure to cooperate

causes material and substantial disadvantage to the insurer."

*Soicher v. State Farm Mut. Auto. Ins. Co.*, 2015 COA 46, ¶ 25.  "The

scope of such noncooperation therefore depends on the specific

policy provision at issue."  *Id.*  The question of whether an insured

failed to cooperate with the insurer is a question of fact.  *See*

---

[3] On appeal, State Farm argues that Griggs vitiated all coverage
under the policy by entering into the assignment agreement
because the policy had a "no voluntary payment" requirement.
*See Travelers Prop. Cas. Co. v. Stresscon Corp.*, 2016 CO 22M, ¶ 13.
It is unclear whether the policy provisions at issue in this case are
like those in *Stresscon*, which "make[] clear that coverage under the
policy does not extend to indemnification for such payments or
expenses in the first place," or if they are instead provisions
"purporting to bar an insured from voluntarily making payments or
incurring expense without the consent of the insurer, for the breach
of which the insurer would be absolved of compliance with its
obligations under the policy."  *Id.* at ¶ 14.  At trial, State Farm
argued that "[Griggs] agreed that there would be no coverage for any
obligation assumed in a contract or agreement, and then he went
and assumed obligations.  That's a breach."  We do not see where
State Farm previously raised this as a coverage issue, so we analyze
it as State Farm asked the jury to analyze it: as an alleged breach of
contract.

*Farmers Auto. Inter-Ins. Exch. v. Konugres*, 119 Colo. 268, 276, 202 P.2d 959, 963 (1949).

¶ 46    State Farm argues that Griggs's performance under the assignment agreement itself constituted noncooperation that substantially prejudiced State Farm. State Farm presented evidence that, by agreeing to submit Goddard's damages to binding, nonappealable arbitration, Griggs deprived State Farm of its rights to settle and control the defense of Goddard's claim, try the case to a jury, and appeal any adverse judgment. Griggs also assumed an obligation to help Goddard sue State Farm, which he did without State Farm's consent. State Farm offered evidence that it made specific requests of Griggs with which he did not comply, including requests to Griggs's personal attorneys (whom Griggs had retained in addition to the attorney State Farm hired to defend him) asking them to seek information and raise concerns about the arbitrator. And State Farm warned Griggs not to enter into the assignment agreement, but he did so anyway.

¶ 47    Considering these facts in the light most favorable to State Farm, we conclude that a reasonable jury could (and did) find in favor of State Farm on its claim for breach of contract. Accordingly,

24

the district court did not err by denying Goddard's C.R.C.P. 50 motion.[4]

B.    Any Error by the District Court in Allowing the Jury to Consider State Farm's Collusion Defense Was Harmless

¶ 48    Next, Goddard contends that the district court erred by denying her C.R.C.P. 50 motion for directed verdict on State Farm's collusion affirmative defense because the evidence was insufficient to allow the jury to consider it.  Even if the district court erred, we conclude that any error was harmless, and therefore reversal is not required.

1.    Additional Background

¶ 49    At the close of all the evidence, Goddard moved for a directed verdict on State Farm's collusion defense pursuant to C.R.C.P. 50.[5] She argued that the evidence was insufficient to establish collusion because State Farm had only offered evidence of two people working

---

[4] Because of this disposition, we need not address State Farm's argument that Goddard's initial settlement demand did not satisfy the "offer rule" such that State Farm could not have breached its duty to settle by rejecting it.

[5] Goddard moved for a directed verdict on State Farm's reasonableness and fraud affirmative defenses too.  But State Farm withdrew its fraud defense and Goddard does not appeal the district court's decision on the reasonableness defense.

together to accomplish a goal and the arbitration had all the hallmarks of a fair proceeding.

¶ 50    State Farm asserted that the arbitration award and the resulting judgment were the product of collusion.  Among other things, it contended that the assignment agreement itself, including the selection of what it characterized as a non-neutral arbitrator and the waiver of State Farm's rights to a jury trial and an appeal, demonstrated collusion.

¶ 51    The district court denied Goddard's motion.  It determined that State Farm had presented sufficient evidence from which a reasonable jury could find collusion.  And it agreed with State Farm that testimony regarding the arbitration could be compelling to the jury when considering the reasonableness of the arbitration award.

¶ 52    The district court instructed the jury to consider State Farm's collusion affirmative defense only if it first found that Goddard had proved her counterclaim for bad faith breach of insurance contract. The relevant part of the verdict form tracked the instruction:

> Question 2: Has Ms. Goddard proved by a preponderance of the evidence her counterclaim for bad faith breach of insurance contract?

Answer (circle one):   YES      NO

If you answered "NO" to Question No. 2, please sign this form and do not answer the remaining questions.

Question 3 addressed State Farm's collusion defense.

¶ 53    Ultimately, the jury returned a verdict for State Farm, finding that Goddard had not proved her counterclaim for bad faith breach of insurance contract.  The jury did not reach the merits of the collusion defense.

### 2.    Preservation and Standard of Review

¶ 54    As an initial matter, we reject Goddard's contention that this issue is preserved because she raised it in her motion for summary judgment.  We do not review a denial of a motion for summary judgment because it is not a final order.  *Feiger, Collison & Killmer v. Jones*, 926 P.2d 1244, 1250 (Colo. 1996); *Manuel v. Fort Collins Newspapers, Inc.*, 631 P.2d 1114, 1116 (Colo. 1981).

¶ 55    Even so, Goddard moved for directed verdict on this issue at the close of evidence, which preserved the issue.  As stated above, in determining whether there is evidence of sufficient probative force to support the district court's ruling on a motion for directed verdict, we must consider all the facts in the light most favorable to

27

the nonmoving party and determine whether a reasonable jury could have found in favor of the nonmoving party. *Flores*, 994 P.2d at 457.

¶ 56 If we conclude that the district court erred, we must consider whether the error requires reversal. We will deem an error harmless, and thus will not reverse a judgment, unless the error resulted in substantial prejudice to a party. *Walker v. Ford Motor Co.*, 2017 CO 102, ¶ 21; *see also* C.R.C.P. 61 ("The court at every stage of the proceeding must disregard any error or defect in the proceeding which does not affect the substantial rights of the parties.").

### 3. Analysis

¶ 57 Goddard contends that State Farm's evidence did not amount to collusion and that the district court erred by allowing the jury to consider collusion as an affirmative defense. But we need not decide whether the evidence State Farm offered at trial was sufficient to fend off a motion for directed verdict because the jury never considered the merits of the collusion defense. So even if the district court erred, we conclude that the error was harmless and does not warrant reversal.

¶ 58    The district court instructed the jury to consider collusion only if it first found that Goddard had proved her counterclaim for bad faith breach of insurance contract. "Absent evidence to the contrary, we presume that a jury follows a trial court's instructions." *Qwest Servs. Corp. v. Blood*, 252 P.3d 1071, 1088 (Colo. 2011).

¶ 59    The verdict form for Goddard's counterclaim aligned with the jury instruction. The verdict form first asked: "Has Ms. Goddard proved by a preponderance of the evidence her counterclaim for bad faith breach of insurance contract?" The foreperson circled "NO." Because the jury answered this question in the negative, it was instructed not to answer any of the remaining questions, including whether State Farm had proved its affirmative defense that the "judgment was the product of collusion or other undue means." The remainder of the questions were left blank, as instructed.

¶ 60    Collusion is an affirmative defense. "By its nature, an affirmative defense 'does not negate the elements of a plaintiff's claim, but instead precludes liability even if all of the elements of a plaintiff's claim are proven." *Purzel Video GmbH v. Smoak*, 11 F. Supp. 3d 1020, 1031 (D. Colo. 2014) (citation omitted); *see also*

29

*Soicher*, ¶ 18 ("[A]n affirmative defense is not merely a denial of an element of a plaintiff's claim, but rather it is a legal argument that a defendant may assert to require the dismissal of a claim, notwithstanding the plaintiff's ability to prove the elements of that claim."); *Black's Law Dictionary* 528 (11th ed. 2019) (defining affirmative defense as "[a] defendant's assertion of facts and arguments that, if true, will defeat the plaintiff's . . . claim, even if all the allegations in the complaint are true"). Thus, if a jury finds that all elements of a claim are not proven, success on an affirmative defense becomes irrelevant.

¶ 61 Where, as here, a jury finds that a claim fails on its elements and, as a result, never reaches the merits of an affirmative defense to that claim, any error in submitting the affirmative defense to the jury is harmless. *See iFreedom Direct v. First Tenn. Bank Nat'l*, 540 F. App'x 823, 828 (10th Cir. 2013) (reasoning that any alleged error in submitting a defense to a jury "should be disregarded" when the jury found no breach of contract and did not consider the defense); *cf. Leaf v. Beihoffer*, 2014 COA 117, ¶ 12 (concluding that, if a plaintiff fails to establish any element of his negligence claim, any errors related to the other elements are harmless because the

plaintiff cannot prevail in any event); *Dunlap v. Long*, 902 P.2d 446, 448-49 (Colo. App. 1995) (concluding that a jury determination that the plaintiffs suffered no injury or damages rendered harmless any error relating only to the defendant's liability).

¶ 62 And to the extent Goddard argues that the alleged error is not harmless because the jury was tainted by admission of evidence related to the collusion affirmative defense, we disagree. Goddard did not object to admission of the collusion-related evidence during trial based on prejudice. And she did not move for a directed verdict on collusion until the close of evidence. By then, the jury had heard all the evidence. So even if the district court had entered a directed verdict when Goddard asked for it, the jury still would have heard the collusion-related evidence.

¶ 63 Thus, we conclude that any error by the district court in denying Goddard's C.R.C.P. 50 motion on State Farm's collusion affirmative defense was harmless, so reversal is not required.

C. The District Court's Evidentiary Rulings Were Sound

¶ 64 Finally, Goddard contends the district court erred by admitting (1) the Azar fee agreement and (2) "evidence of . . . the existence of *Nunn* agreements from other cases" in which the Azar

31

firm has been involved.  We reject the first contention and conclude that the second contention was either not preserved or harmless.

### 1. Standard of Review and Applicable Law

¶ 65 We review a district court's evidentiary ruling for an abuse of discretion.  *Murray v. Just In Case Bus. Lighthouse, LLC*, 2016 CO 47M, ¶ 16.  A court abuses its discretion when its decision is manifestly arbitrary, unreasonable, or unfair, or based on a misapplication or misunderstanding of the law.  *Credit Serv. Co., Inc. v. Skivington*, 2020 COA 60M, ¶ 17; *Giampapa v. Am. Fam. Mut. Ins. Co.*, 919 P.2d 838, 842 (Colo. App. 1995).

¶ 66 Unless otherwise prohibited by law, all relevant evidence is admissible.  CRE 402; *Murray*, ¶ 19.  Relevant evidence is any evidence "having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."  CRE 401.

¶ 67 Relevant evidence may be excluded if "its probative value is substantially outweighed by the danger of unfair prejudice."  CRE 403.  When reviewing a district court's decision to admit evidence, "we accord the evidence its maximum probative value as weighed

against its minimum prejudicial effect." *Walker v. Ford Motor Co.*, 2015 COA 124, ¶ 46; *see Murray*, ¶ 19.

¶ 68    Evidentiary rulings that do not affect a substantial right of a party are harmless and do not warrant reversal. CRE 103(a); C.R.C.P. 61. An error affects the substantial rights of the parties if it substantially influenced the outcome of the case or impaired the basic fairness of the trial itself. *Laura A. Newman, LLC v. Roberts*, 2016 CO 9, ¶ 24; *Bernache v. Brown*, 2020 COA 106, ¶ 26.

### 2. The District Court Did Not Abuse Its Discretion by Admitting the Azar Fee Agreement

#### a. Additional Background

¶ 69    Before trial, Goddard moved in limine to preclude State Farm from offering the Azar fee agreement into evidence, arguing that the evidence was irrelevant and unfairly prejudicial. The district court denied the motion and ordered that the fee agreement could be admitted at trial. It found that State Farm had demonstrated the relevance of the fee agreement and that Goddard had not "meaningfully attempt[ed] to argue that if the fee agreement is admitted, a jury may reach a decision on the incorrect basis."

¶ 70    At trial, State Farm offered the Azar fee agreement through its first witness and the district court admitted it over Goddard's renewed objection. Throughout trial, State Farm argued that the fee agreement "financially incentivized the Azar firm to sabotage any chance of an out-of-court settlement with State Farm" by increasing the percentage of its contingent fee if it took the case to trial. State Farm also argued that the fee agreement's pre-authorization of costs in the amount of $25,000 precluded settlement of Goddard's claim for any amount equal to or less than the policy limit of $25,000.

¶ 71    Although it admitted the Azar fee agreement itself, the district court repeatedly sustained Goddard's objections to State Farm's attempts to elicit testimony that there was something improper about the agreement, that it fell below the appropriate standard of care, or that it deviated from the form contingent fee agreement approved by the Colorado Supreme Court. C.R.C.P. Ch. 23.3, Rule 7, Form 2 (2019).

### b.    Analysis

¶ 72    Goddard contends that the district court erred by admitting the Azar fee agreement because it was irrelevant and prejudicial. We disagree.

¶ 73    As an initial matter, we reject State Farm's contention that Goddard waived this claim or invited this error.  First, before trial, Goddard moved in limine to preclude admission of the Azar fee agreement.  She argued in her motion that State Farm sought to "make some negative inference against Ms. Goddard's counsel and take advantage of well-known biases against plaintiff attorneys."  A court's definitive ruling on a motion in limine preserves the issue for appeal.  *See* CRE 103(2) ("Once the court makes a definitive ruling on the record admitting or excluding evidence, either at or before trial, a party need not renew an objection or offer of proof to preserve a claim of error for appeal."); *Uptain v. Huntington Lab, Inc.*, 723 P.2d 1322, 1330-31 (Colo. 1986) (pretrial ruling on a motion in limine sufficiently preserves an issue for appeal).

¶ 74    Second, to the extent that State Farm argues that Goddard waived this issue by referring to the Azar fee agreement during her defense case, we disagree because State Farm had already admitted

the evidence over Goddard's objection.  A party does not waive its right to challenge evidence admitted over its objection by responding to it during trial.  *Cf. Bernache*, ¶ 12 (concluding that party did not waive objection or invite error by preventatively addressing evidence the court ruled admissible before trial).

¶ 75 Although Goddard preserved her objection, we conclude that the district court did not abuse its discretion by admitting the Azar fee agreement.  State Farm argued that the agreement financially incentivized the Azar firm to prevent an out-of-court settlement of Goddard's claim and gave the Azar firm the power to do so.  State Farm also used the Azar fee agreement to highlight what it argued were collusive terms in the assignment agreement between Goddard and Griggs.  Accordingly, the Azar fee agreement was relevant to the causation element of Goddard's counterclaim for bad faith breach of insurance contract and to State Farm's collusion affirmative defense.

¶ 76 But Goddard contends that, by excluding certain testimony about the Azar fee agreement once it was admitted, the district court demonstrated that the agreement itself was unfairly prejudicial and should not have been admitted.  We disagree.

¶ 77    The Azar fee agreement was some evidence from which the

jury could infer that Goddard and her attorneys caused the

settlement failure.  Had the jury reached the collusion defense, it

also would have allowed the jury to infer that the assignment

agreement between Goddard and Griggs was collusive based on a

comparison of the arbitration terms in the two agreements.  We

acknowledge that these inferences were prejudicial to Goddard's

case, but they were not unfairly prejudicial.  Unfair prejudice refers

to "an undue tendency on the part of admissible evidence to suggest

a decision made on an improper basis." *People v. Coney*, 98 P.3d

930, 933 (Colo. App. 2004) (quoting *People v. Gibbens*, 905 P.2d

604, 608 (Colo. 1995)).  The Azar agreement did not suggest to the

jury that it should resolve Goddard's claim on an improper basis.

We see no abuse of discretion.

3.    The District Court's Admission of "Evidence of . . . the
Existence of *Nunn* Agreements from Other Cases" Does Not
Require Reversal

a.    Additional Background

¶ 78    In discovery, State Farm apparently disclosed a "Table of

Cases," which was "a spreadsheet that lists a total of 17 cases" from

2013-2016 that "advanced to contested arbitration hearings,"

thirteen of which involved both the Azar firm and the arbitrator named in the assignment agreement between Goddard and Griggs. State Farm also disclosed as potential witnesses several lawyers who were involved in those cases. Before trial, Goddard moved in limine to preclude admission of the other assignment agreements (which she called "*Nunn* agreements") and witness testimony about the agreements, arguing that such evidence was irrelevant, misleading, and confusing to the jury.

¶ 79     The district court granted Goddard's motion in part and denied it in part. It first noted that neither party had "detail[ed] with specificity the evidence sought to be admitted or precluded." Its order on the motion in limine referred only to the Table of Cases "as containing the type of information sought to be addressed" by Goddard's motion. The court explained that State Farm had not yet established its "claims of multiple inflated arbitration awards as well as a 'lucrative relationship' benefitting [the arbitrator]." Still, it concluded that the cases listed in the Table of Cases that involved both the arbitrator and the Azar firm were relevant to State Farm's defenses. Thus, it ruled that State Farm could introduce three other assignment agreements to demonstrate, among other things,

that the Azar firm had a practice of hiring the same arbitrator with the aim of securing inflated awards. To mitigate any prejudice resulting from the fact that the arbitrator could not testify (presumably to contradict State Farm's collusion accusations), the court also authorized Goddard to introduce assignment agreements from three other cases handled by the Azar firm providing for arbitration by any other arbitrator. The court did not make a ruling in limine on any other evidence or witness testimony related to assignment agreements from other cases.

¶ 80    At trial, State Farm called Franklin Patterson as a witness. Patterson represented State Farm for part of the litigation against Griggs and Goddard. He testified that, during the course of his representation, he contacted other defense lawyers seeking other assignment agreements involving both the Azar firm and the same arbitrator as the present case. He learned of approximately thirty such agreements and obtained copies of nineteen. State Farm's counsel showed Patterson three assignment agreements from other cases but did not move to admit them or show them to the jury. When State Farm's counsel started to show Patterson a fourth agreement, Goddard's counsel objected based on the court's in

limine ruling. At a bench conference the court clarified that the in limine ruling allowed State Farm to show three agreements.

¶ 81 Patterson then testified that, after finding these other assignment agreements, he objected to the arbitration in a letter he sent to Griggs's personal counsel. He wrote that he believed Azar and the arbitrator had a "close and frequent relationship."

### b. Analysis

¶ 82 Goddard contends that the district court "impermissibly allowed State Farm to introduce evidence regarding other *Nunn* agreements proposed or entered into by Azar" because the evidence was irrelevant, "highly prejudicial[,] and designed to induce the jury to draw impermissible inferences based upon pure speculation and bias." In support of this argument, Goddard cites two parts of the record: (1) her motion in limine and the court's order partially granting and partially denying it; and (2) eleven pages of Patterson's trial testimony. We conclude any error was harmless.

¶ 83 First, to the extent Goddard contends that the district court erroneously admitted assignment agreements from other cases involving Azar's clients, Goddard does not point us to any part of the trial record where such agreements were actually admitted into

evidence. On the contrary, even though the district court ruled in limine that State Farm could admit three assignment agreements, it appears that State Farm did not offer them. Thus, even if the court erred by ruling in limine that State Farm would be allowed to introduce three assignment agreements, such error was harmless because the evidence was not admitted. *See* C.R.C.P. 61; *Gonzales v. Mascarenas*, 190 P.3d 826, 831 (Colo. App. 2008) (concluding that plaintiff could not show prejudice with respect to the denial of a motion in limine when the subject evidence was not admitted).

¶ 84    Second, to the extent Goddard contends that the district court erred by admitting Patterson's testimony about assignment agreements from other cases, she did not preserve this issue. As the district court noted, Goddard's motion in limine did not identify specific witness testimony she sought to preclude. And even if it had, the court did not rule that such testimony was admissible. The only in limine ruling the court made on this issue was that each side could introduce three assignment agreements from other cases. Although a party abiding by an in limine ruling need not renew an objection at trial to preserve the issue for review, *see Bernache*, ¶ 9, because there was no definitive in limine ruling on

41

the scope of permissible testimony about assignment agreements in other cases, Goddard was required to object at trial to preserve the issue for appellate review, *see Higgs v. Dist. Ct.*, 713 P.2d 840, 859 (Colo. 1985) (concluding that the denial of a motion in limine "directed toward a broad array of evidence" does not "dispense with the obligation to make a contemporaneous objection to the evidence when offered at trial"). *See also* CRE 103(a).

¶ 85    But Goddard did not cite to any part of the record where she objected to Patterson's testimony about assignment agreements from other cases based on relevance or unfair prejudice. Notably, the transcript pages Goddard cites in her briefs do not include the testimony to which she appears to object on appeal. Giving Goddard the benefit of the doubt, we reviewed the entirety of Patterson's testimony. Although Goddard lodged several objections on other grounds — many of which were sustained — we did not find any objections based on CRE 402 or 403. Because she did not object, she did not preserve this issue for appellate review. *See Am. Fam. Mut. Ins. Co. v. DeWitt*, 218 P.3d 318, 325 (Colo. 2009) ("In order to properly preserve an objection to evidence admitted at trial, a timely and specific objection must appear in the trial court

record."); *Wycoff v. Grace Cmty. Church of Assemblies of God*, 251 P.3d 1260, 1269 (Colo. App. 2010) ("[O]nly in a 'rare' civil case, involving 'unusual or special' circumstances — and even then, only 'when necessary to avert unequivocal and manifest injustice' — will an appellate court reverse based on an unpreserved claim of error.") (citations omitted).

¶ 86     We acknowledge that, during the bench conference after Goddard's counsel objected to State Farm's attempt to have Patterson identify a fourth assignment agreement, the district court said, referencing the in limine ruling, "He can testify as to 19.  That was the deal."  We do not read the in limine order as affirmatively authorizing Patterson to testify that he obtained nineteen assignment agreements involving both the Azar firm and the same arbitrator.  But even assuming that the in limine ruling authorized that testimony such that Goddard did not have to renew her objection to it at trial, and even assuming the district court erred by allowing Patterson to testify about the number of agreements he found, we conclude that the error was harmless.  *See* C.R.C.P. 61; *Bernache*, ¶ 26.

¶ 87 The testimony and references to it in State Farm's closing argument were relatively brief parts of a six-day trial. The evidence primarily supported State Farm's collusion defense, which the jury never reached. And Goddard's attorney effectively cross-examined Patterson on this issue, causing him to admit that the Azar firm handles hundreds of cases each year, that Patterson was only able to obtain nineteen assignment agreements identifying this arbitrator, and that only four or five of the nineteen cases actually went to arbitration. Patterson even admitted that State Farm itself had used a particular pair of arbitrators *seventy* times.

¶ 88 Considering the evidence in context, we do not conclude that it substantially influenced the outcome of the case or impaired the basic fairness of the trial itself. *See Bernache*, ¶ 26. Thus, we conclude any error was harmless.

### III. Conclusion

¶ 89 The judgment is affirmed.

CHIEF JUDGE BERNARD and JUDGE VOGT concur.