24CA1450 Aircomm v DISH Wireless 12-31-2025

COLORADO COURT OF APPEALS

---

Court of Appeals No. 24CA1450
City and County of Denver District Court No. 22CV32353
Honorable Sarah B. Wallace, Judge

---

Aircomm of Avon, LLC; Atlantic Coast Communications, LLC; CCATT, LLC; CCTMO, LLC; CCTM1, LLC; CCTM2, LLC; Coverage Plus Antenna Systems, LLC; Crown Atlantic Co., LLC; Crown Castle GT Co., LLC; Crown Castle MU, LLC; Crown Castle South, LLC; Crown Castle Towers 05, LLC; Crown Castle Towers 06-2, LLC; Crown Castle Towers 09, LLC; Crown Communication, LLC; Global Signal Acquisitions, LLC; Global Signal Acquisitions II, LLC; Global Signal Acquisitions III, LLC; Global Signal Acquisitions IV, LLC; Goldenstate Towers, LLC; High Point Management Co., LLC; ICB Towers, LLC; Interstate Tower Communications, LLC; Intracoastal City Towers, LLC; Pinnacle Towers Acquisition, LLC; Pinnacle Towers Asset Holding, LLC; Pinnacle Towers, LLC; Pinnacle Towers III, LLC; Radio Station WGLD, LLC; Shaffer & Associates, Inc.; Sierra Towers. Inc.; Tower Development Corporation; Tower Systems, Inc.; Tower Technology Co. of Jacksonville, LLC; Tower Ventures III, LLC; WCP Wireless Lease Subsidiary, LLC; and TVHT, LLC,

Plaintiffs-Appellants,

v.

DISH Wireless LLC,

Defendant-Appellee.

---

JUDGMENT AFFIRMED

Division I
Opinion by JUDGE SCHUTZ
J. Jones and Grove, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced December 31, 2025

---

Womble Bond Dickinson (US) LLP, Kendra N. Beckwith, Nathan B. Thoreson, Denver, Colorado; Davis Graham & Stubbs, LLP, Daniel A. Richards, Denver, Colorado for Plaintiffs-Appellants

Wheeler Trigg O'Donnell LLP, Hugh Q. Gottschalk, Frederick R. Yarger, Miranda B. Worthington, Rebekah L. Nickel, Denver, Colorado, for Defendant-Appellee

¶ 1  Plaintiffs, which we refer to collectively as Crown,[1] appeal the trial court's judgment in favor of defendant, DISH Wireless L.L.C. (DISH). The dispute centers around whether a master lease agreement (MLA) and related site lease acknowledgments (SLA) required DISH to pay additional rent for space beyond the exterior of DISH's equipment needed to comply with the National Electric Code (Nat'l Fire Prot. Ass'n 2023) (NEC).

¶ 2  We conclude that (1) the trial court properly determined that the MLA was ambiguous and therefore properly allowed the jury to

---

[1] There are thirty-seven Crown-related entities named as plaintiffs, which all asserted the same claims and arguments on appeal: Aircomm of Avon, LLC; Atlantic Coast Communications, LLC; CCATT, LLC; CCTMO, LLC; CCTM1, LLC; CCTM2, LLC; Coverage Plus Antenna Systems, LLC; Crown Atlantic Co., LLC; Crown Castle GT Co., LLC; Crown Castle MU, LLC; Crown Castle South, LLC; Crown Castle Towers 05, LLC; Crown Castle Towers 06-2, LLC; Crown Castle Towers 09, LLC; Crown Communication, LLC; Global Signal Acquisitions, LLC; Global Signal Acquisitions II, LLC; Global Signal Acquisitions III, LLC; Global Signal Acquisitions IV, LLC; Goldenstate Towers, LLC; High Point Management Co., LLC; ICB Towers, LLC; Interstate Tower Communications, LLC; Intracoastal City Towers, LLC; Pinnacle Towers Acquisition, LLC; Pinnacle Towers Asset Holding, LLC; Pinnacle Towers, LLC; Pinnacle Towers III, LLC; Radio Station WGLD, LLC; Shaffer & Associates, Inc.; Sierra Towers. Inc.; Tower Development Corporation; Tower Systems, Inc.; Tower Technology Co. of Jacksonville, LLC; Tower Ventures III, LLC; WCP Wireless Lease Subsidiary, LLC; and TVHT, LLC.

determine the scope of the parties' agreement; (2) the jury's verdict is supported by evidence in the record; and (3) the trial court appropriately entered a declaratory judgment in DISH's favor based on the jury's findings and the court's independent assessment of the evidence.  Accordingly, we affirm the judgment.

## I.  Background and Procedural History

### A.  Deal Overview and Subsequent Relationship Breakdown

¶ 3    In 2019, DISH entered into an asset purchase agreement with T-Mobile U.S., Inc. and Sprint Corporation to obtain the assets and liabilities of Boost Mobile, Virgin Mobile, and other mobile service providers.  As a condition of the merger, the Federal Communications Commission required DISH to make its 5G[2] broadband network available to 20% or more of the United States population by June 2022 and 75% by 2025.

¶ 4    To meet these aggressive deadlines, in spring 2020 DISH negotiated with Crown, which owns and maintains an extensive nationwide infrastructure to facilitate wireless communications.

---

[2] 5G is a wireless standard for mobile devices that supports data transfers for complex home networks and internet-enabled appliances.  Merriam-Webster Dictionary, https://perma.cc/4MKJ-UU9X.

Wireless network operators, such as DISH, enter into lease agreements with Crown to obtain access to its towers and adjacent ground space to install network carrying equipment on and near the tower. Wireless operators must install equipment on both the ground and the tower for their networks to operate.

¶ 5    Between the spring and summer of 2020, DISH discussed plans with Crown to install its network equipment platforms on the ground space at thousands of Crown's tower sites. As part of their negotiations, Crown and DISH coordinated and discussed DISH's template plans for the platforms. Crown provided comments to DISH concerning the proposed configurations. The template for the equipment platforms included a cabinet with doors that opened and closed to allow service of DISH's equipment (door swings). During their negotiations, both parties were aware that NEC safety requirements mandate three feet of unobstructed space adjacent to some of DISH's equipment (NEC workspace). *See* NEC § 110.26(A)(1). The parties were also aware that the doors on part of DISH's equipment occasionally need to be opened and closed to service the components. Despite this knowledge, the MLA and SLAs

failed to expressly address whether DISH would be required to pay additional rent for the NEC workspace and door swings.

¶ 6    In November 2020, the parties signed the MLA, which permitted DISH to lease space on up to 20,000 communication towers across the United States in exchange for a single monthly access fee. The monthly access fee was the only rent provision that DISH was explicitly required to pay for access to Crown's sites, provided DISH's equipment was within the standard equipment configuration (SEC) laid out in the MLA. The SEC defined the leased ground space as "not to exceed 5' x 7', inclusive of any required set-back, buffer or spark radius which must be contained entirely within such 5' x 7'" (5' x 7' area). The MLA did not define the phrase "set-back, buffer or spark radius," or any of the individual terms therein.

¶ 7    Crown and DISH entered into an SLA for each new site on which DISH placed its equipment. Each SLA required the parties to acknowledge whether the equipment configuration on that site was consistent with the SEC or, rather, required an expanded configuration. For all but a handful of leases, the parties

acknowledge that the equipment configuration complied with the SEC.

¶ 8     Under the MLA,

> [t]he full execution and delivery of an SLA shall grant to [DISH] a lease for the exclusive use of the Leased Property described in such SLA and the non-exclusive use, for access purposes, of the portions of the Site not leased or licensed to third parties or restricted to Lessor's use on the terms and subject to the conditions set forth in the SLA and [the MLA].

The MLA also gives DISH a "non-exclusive right to access . . . each Leased Property . . . to enable [DISH] to install . . . remove, operate, repair, replace, maintain and/or monitor [DISH's] equipment." If DISH needs to lease space beyond the SEC, it is required to pay additional rent in accordance with the MLA.

¶ 9     Between November 2020 and July 2021, the parties executed thousands of SLAs. Around September 2021, Crown informed DISH that it thought DISH needed to pay additional rent for the NEC workspace and door swings space for thousands of SLAs. Shortly thereafter, DISH submitted various equipment designs in an effort to address the parties' disagreements. The parties re-entered

negotiations to resolve the dispute but their efforts were unsuccessful.

### B.    Litigation and Trial

¶ 10    In August 2022, Crown filed a complaint asserting three claims for relief: (1) breach of the MLA and SLAs regarding the door swings; (2) breach of the MLA and SLAs regarding the NEC workspace; and (3) declaratory relief from the court to compel DISH to pay additional rent for each alleged breach.  Crown subsequently removed its door swing claim through an amended complaint.

¶ 11    In response, DISH asserted multiple counterclaims including, as relevant on appeal, a claim for declaratory judgment that the MLA and SLAs do not require DISH to pay additional rent to accommodate the NEC workspace and door swings.  The court set the matter for trial.

¶ 12    The parties filed cross-motions for summary judgment on whether the MLA and SLAs require DISH to pay additional rent for the NEC workspace or the door swings.  After a hearing, the trial court ruled that the MLA is ambiguous because it is "susceptible to multiple readings."  Specifically, it concluded that Crown had presented a reasonable argument that the 5' x 7' area does not

6

include the additional area needed to accommodate the NEC workspace or the door swings. Conversely, the court also agreed with DISH that it was not clear that the "setback, buffer or spark radius" language in section 1(D) of the MLA includes the NEC workspace needed for maintenance. Because the MLA is susceptible of more than one reasonable interpretation, the court concluded that it is ambiguous and the resolution of that ambiguity was "an issue of fact to be determined by the jury."

¶ 13 With respect to the door swings issue, the court rejected Crown's argument that DISH's claim for declaratory relief was rendered moot by Crown's dismissal of its claim related to the door swings because Crown had never disavowed its right to bring such a claim in the future. But the court also declined to grant DISH's motion for summary judgment on the door swings issue, reasoning that "whether the [door swings require] extra rent is ambiguous for the same reason [that] . . . whether DISH must pay extra rent for the NEC [workspace] is ambiguous."

¶ 14 After the evidentiary portion of the trial, Crown moved for a directed verdict by renewing its argument that the MLA's language is unambiguously in Crown's favor and additionally argued that

DISH had failed to present any evidence supporting its interpretation. The trial court denied the motion and submitted the case to the jury. The jury returned a split verdict, finding that Crown failed to prove its breach of contract claim related to the NEC workspace and DISH failed to prove its breach of contract counterclaim. In view of its findings, the jury declined to award either party damages.

¶ 15 After the trial, the court addressed DISH's request for a declaratory judgment related to the door swings dispute. The court concluded that the jury's verdict included an implied finding that the door swings do not trigger any requirement for DISH to pay additional rent. Thus, the court entered judgment declaring that DISH is not obligated to pay additional rent for the door swings, "so long as the door swings are reasonably placed on the 5' x 7' [area]."

## II. The Trial Court's Summary Judgment Order and Directed Verdict Ruling

¶ 16 Crown argues that the trial court erred by concluding that the MLA is ambiguous about whether DISH is required to pay additional rent for the NEC workspace. We are unpersuaded.

## A. Standard of Review

¶ 17    We review questions of law, such as a trial court's determination that a contract is ambiguous, de novo. *Am. Fam. Mut. Ins. Co. v. Hansen*, 2016 CO 46, ¶ 23. We also review a trial court's denial of a directed verdict de novo. *State Farm Mut. Auto. Ins. Co. v. Goddard*, 2021 COA 15, ¶ 26. In assessing the propriety of a directed verdict, "we must consider all the facts in the light most favorable to the nonmoving party and determine whether a reasonable jury could have found in favor of the nonmoving party." *Id.*

## B. Applicable Law

### 1. Contract Interpretation

¶ 18    "In interpreting a contract, our primary goal is to give effect to the parties' intent." *French v. Centura Health Corp.*, 2022 CO 20, ¶ 25. When a contract is complete and unambiguous, we enforce it according to its plain language. *Klun v. Klun*, 2019 CO 46, ¶ 18. In ascertaining whether contract provisions are ambiguous, we review "the instrument's language and construe it consistent with the plain and generally accepted meaning of the words employed." *Id.* "The meaning of a contract is found by examination of the entire

9

instrument and not by viewing clauses or phrases in isolation."

*U.S. Fid. & Guar. Co. v. Budget Rent-A-Car Sys., Inc.*, 842 P.2d 208, 213 (Colo. 1992).

¶ 19     If the operative contract terms "are susceptible of more than one reasonable interpretation, . . . the terms are ambiguous, and evidence beyond the four corners of the contract is admissible to establish the parties' intent." *French,* ¶ 25.  Mere disagreement between the parties concerning the meaning of contract terms does not establish a contract ambiguity.  *Id.*  In assessing whether an ambiguity exists, the court may conditionally admit extrinsic evidence.  *Pepcol. Mfg. Co. v. Denv. Union Corp.*, 687 P.2d 1310, 1314 n.3 (Colo. 1984).  "If the court, after considering the extrinsic evidence, determines that there is no ambiguity, then the extrinsic evidence must be stricken."  *Id.*; *see also Sandstone Invs. I, LLC v. A. Everett Williams 1963 Tr.*, 53 P.3d 687, 690 (Colo. App. 2001) ("In deciding whether a contract is ambiguous, a court may consider extrinsic evidence bearing upon the meaning of the written terms.

However, the court may not consider the parties' own extrinsic expressions of intent.").[3]

### 2.    Motion for a Directed Verdict

¶ 20    Under C.R.C.P. 50, a party may move for a directed verdict at the close of evidence.  A court properly grants a motion for directed verdict if the evidence, when viewed in the light most favorable to the nonmoving party, compels a conclusion that reasonable people could not disagree with and "no evidence, or legitimate inference therefrom, has been presented upon which a jury's verdict against the moving party could be sustained."  *Mid-Century Ins. Co. v. HIVE Constr., Inc.*, 2025 CO 17, ¶ 20 (quoting *Burgess v. Mid-Century Ins. Co.*, 841 P.2d 325, 328 (Colo. App. 1992)).

---

[3] We acknowledge that there may be some tension between *Pepcol Manufacturing Co. v. Denver Union Corp.*, 687 P.2d 1310 (Colo. 1984), and its progeny, and the supreme court's later statement that "extrinsic evidence cannot create ambiguity; it is an aid to ascertaining the intent of the parties once an ambiguity is found." *Am. Fam. Mut. Ins. Co. v. Hansen*, 2016 CO 46, ¶ 4.  But we need not address any tension that may exist between these cases because the operative contract provisions of the MLA and SLAs are ambiguous based on their plain terms, and also ambiguous when considered in the context of extrinsic evidence of the parties' contractual discussions and course of performance.

## C. Analysis

¶ 21    Crown argues that the plain meanings of "set-back" and "buffer" are clear and unambiguous, and, therefore, section 1(D)'s requirement that "any required set-back or buffer must be entirely contained within the 5' x 7' [area]" unambiguously required DISH to pay additional rent if the NEC workspace does not fit within the 5' x 7' area.  Crown points to a dictionary definition of setback that includes, as one meaning of the word, "the distance of a structure or other feature (such as a well or septic system) from the property line or other feature."  Merriam-Webster Dictionary, https://perma.cc/B3G3-59XV.  This definition, Crown argues, means that "set-back," as it appears in the MLA, refers to the distance between two physical objects or features.  In addition, Crown points to a definition of "buffer" that includes "something that serves as a protective barrier."  Merriam-Webster Dictionary, https://perma.cc/T7DM-B7B6.  From this definition, Crown posits that the use of "buffer" in section 1(D) "refers to the space necessary to safely operate something or perform a task."

¶ 22    Crown also argues that DISH's interpretation of the MLA and SLAs would render the language of section 1(D) superfluous.  Thus,

12

Crown contends, section 1(D)'s terms must be construed, as a matter of law, to mean that the NEC workspace is not part of the area encompassed by the base rent, and therefore DISH must pay additional rent for that space.

¶ 23     DISH responds that the trial court properly determined that the MLA is ambiguous because the plain meanings of "set-back" and "buffer" do not unambiguously encompass the NEC workspace. For example, DISH notes that the MLA does not provide or reference any definition of set-back or buffer, much less Crown's proffered definitions.

¶ 24     DISH also notes that the MLA does not equate buffer or set-back with NEC workspace. Furthermore, DISH notes that the MLA and SLAs do not describe a set-back or buffer by reference to a property line, any physical feature, or a protective barrier. DISH also points to trial testimony from an NEC expert who stated that he has never heard or used the term set-back or buffer when referring to the NEC workspace or other NEC requirements.

¶ 25     Relatedly, DISH argues that section 7 of the MLA grants it a nonexclusive easement to access its equipment for purposes of maintenance and monitoring. Specifically, it grants DISH

a non-exclusive right to access, from a public right-of-way, each Leased Property to the extent reasonably deemed necessary by [DISH] to enable [DISH] to install, photograph, remove, operate, repair, replace, maintain and/or monitor [DISH's] Equipment and to otherwise utilize each Leased Property for the Purpose, in each case, to such extent, and in such means and manners (including, without limitation, on foot or by motor vehicle, including trucks and other heavy equipment . . . )as [DISH] deems reasonably necessary.

¶ 26    These provisions, according to DISH, at a minimum create ambiguity regarding whether the NEC workspace requirements trigger additional rent under the MLA.

¶ 27    In further support of its position, DISH points to evidence that, when they negotiated the MLA, all parties were aware of the NEC workspace requirements, and that the NEC workspace would extend beyond the 5' x 7' area, but that neither the MLA nor the SLAs contain an express provision requiring DISH to pay Crown additional rent for that additional space.  In addition, Crown worked with DISH in agreeing upon the SEC and approved the configuration — whether based on the SEC or otherwise — used by DISH for each SLA.

14

¶ 28    DISH also points to testimony from one of DISH's negotiators that during the MLA negotiations, Crown's deputy counsel said, "We're not going to charge you for door swings, let's move on." Finally, DISH points out that the parties executed thousands of SLAs before Crown first indicated that DISH might owe additional rent for the NEC workspace. And it was not until late 2021 that Crown first notified DISH that it was reserving the right to pursue additional rent for the NEC workspace and door swings. This extrinsic evidence, DISH argues, supports its contention that when the agreements were executed, the parties did not intend that DISH would be charged additional rent for either the NEC workspace or the door swings. *See Sandstone*, 53 P.3d at 690.

¶ 29    We are persuaded by DISH's arguments. Recall that for a contract to be ambiguous, the language in question must be susceptible of more than one reasonable interpretation. *French*, ¶ 25. Both parties presented reasonable interpretations that a jury could accept when assessing the meaning of section 1(D).

¶ 30    While "set-back" and "buffer" do not have any defined meaning in the MLA and SLAs, as the trial court noted, the analysis does not end there. Based solely on the language of the MLA, it is unclear

whether section 1(D) was meant to include the NEC workspace, considering that the NEC requirements, at least in part, are in place to allow for maintenance and monitoring of the equipment. This uncertainty is amplified by section 7 of the MLA, which gives DISH a nonexclusive right to access the leased property to install, operate, and repair DISH's equipment.

¶ 31     Moreover, the parties do not dispute that, despite their awareness of the need for the NEC workspace, no provision of the MLA or the subsequent SLAs definitively or directly requires DISH to pay additional rent for the NEC workspace. In the absence of an express designation in the parties' agreement, and because there is record support for both parties' interpretations, the trial court properly found that this was an issue of fact for a jury to resolve.

¶ 32     Nor are we persuaded by Crown's arguments that the terms "set-back" and "buffer" necessarily refer to the NEC workspace. As the complete definitions of the terms relied on by Crown make clear, the specific meanings Crown attributes to these terms are not their only meanings. Moreover, as DISH points out, the definitions emphasized by Crown contain terms — such as boundary, feature, and protective barriers — that the MLA and SLAs do not further

reference or define. Finally, the jury heard testimony that the interpretation urged by DISH does not render the terms of section 1(D) meaningless because DISH presented evidence that these terms are not intended to encompass the NEC workspace, but, rather, specialized equipment DISH installed on the sites — including generators, gas tanks, and fuel cells. For a directed verdict to be appropriate, it was Crown's burden to demonstrate that the presented evidence, viewed in the light most favorable to DISH, compelled the conclusion that DISH's defenses failed. *See Mid-Century*, ¶ 20. But we conclude that reasonable jurors could have found in DISH's favor based on the evidence.

¶ 33    In reaching this conclusion, we do not need to assess which of the parties' arguments we find more persuasive. Instead, we must determine whether DISH presented reasonable interpretations of the disputed provisions, and whether DISH offered evidence at trial to support those interpretations. Because both occurred, it was the jury's responsibility to resolve that factual dispute. *See E. Ridge of Fort Collins, LLC v. Larimer & Weld Irrigation Co.*, 109 P.3d 969, 974 (Colo. 2005) ("When an ambiguity has been determined to exist, the meaning of its terms is generally an issue of fact to be determined

in the same manner as other factual issues."); *see also People v. Harrison*, 2020 CO 57, ¶ 33 ("An appellate court may not serve as a thirteenth juror and consider whether it might have reached a different conclusion than the jury.").

¶ 34 For similar reasons, we reject Crown's alternative argument that the trial court erred by denying its motion for a directed verdict on the breach of contract claim because DISH failed to present any evidence at trial supporting its interpretation of section 1(D). Consistent with its argument that section 1(D)'s language is unambiguous, Crown argues that DISH failed to present any evidence supporting its interpretation of section1(D). Therefore, Crown argues, the extrinsic evidence that DISH presented at trial — including the templates that DISH shared with Crown prior to executing the MLA, witness testimony about how the parties intended section 1(D) to function, and evidence related to Crown's failure to immediately enforce the MLA — did not create a factual dispute.

¶ 35 DISH responds that Crown was not entitled to a directed verdict because Crown erroneously insisted that its reading of the MLA is the only reasonable interpretation. Furthermore, DISH

18

notes that Crown failed to object to the admission of any of the contested evidence during trial and the court instructed the jury that it was permitted to consider evidence, including "the parties' negotiations" and "earlier dealings," in discerning the parties' intent concerning the meaning of these terms.[4]

¶ 36 Because we have already determined that the trial court did not err by finding that the MLA is ambiguous, the court properly allowed the admission of extrinsic evidence. *See E. Ridge*, 109 P.3d at 974. Crown does not appear to challenge a single piece of evidence that was admitted; rather, it seems to be challenging allowing the matter to proceed to trial at all because, it argues, there is no reasonable alternative reading of section 1(D).

¶ 37 Crown accurately points out that it presented evidence supporting its interpretation of section 1(D). But that does not lead to a conclusion that the interpretation urged by DISH was untenable. Indeed, we have already determined that section 1(D)'s plain meaning does not unambiguously compel DISH to pay

---

[4] This instruction was based on Colorado's model civil jury instruction for determining the parties' contractual intent, CJI-Civ. 30:31 (2025), which Crown does not challenge on appeal.

19

additional rent for NEC workspace. And DISH presented the jury with evidence supporting its urged interpretation. It necessarily follows that Crown's motion for a directed verdict on the breach of contract claim could not be granted.

¶ 38     DISH also presented evidence in support of its interpretation of section 7 of the MLA, which gives DISH a nonexclusive right to access its equipment for repairs and maintenance, including testimony from an NEC expert that NEC workspace can be in a "general open space" and it "does not need to be cordon[ed] off at all times."[5]

¶ 39     Moreover, the jury's verdict on the NEC workspace claim, and the trial court's and our independent assessment of the evidence, lead to the conclusion that reasonable minds could construe the direct and circumstantial evidence to support DISH's interpretation of the MLA relative to the NEC workspace dispute. Thus, the trial

---

[5] Illustrative of their competing interpretations of the various contractual terms and the evidence, at oral argument Crown argued that NEC workspace could not be used for any shared purpose. True, the jury heard evidence to support Crown's interpretation. But the jury also heard evidence that the NEC workspace did not need to be dedicated for DISH's exclusive use. This is simply another illustration of ambiguous language and conflicting evidence that the court properly allowed the jury to resolve.

court did not err by concluding that DISH presented sufficient evidence to defeat Crown's motion for a directed verdict.

### III. Declaratory Judgment on the Door Swings

¶ 40 Finally, Crown contends that the trial court clearly erred by granting DISH's request for declaratory relief on its door swings claim because it lacked record support for its findings. We, again, discern no error.

### A. Standard of Review and Applicable Law

¶ 41 Declaratory judgments are intended to resolve disputes between parties concerning their respective rights under a law, relationship, or controlling instrument — such as a contract. § 13-51-106, C.R.S. 2025; C.R.C.P. 57. In resolving a declaratory judgment dispute, we review the trial court's legal conclusions de novo and its factual findings for clear error. *See Saxe v. Bd. of Trs. of Metro. State Coll. of Denv.*, 179 P.3d 67, 72 (Colo. App. 2007) ("A trial court's decision to accept jurisdiction to enter a declaratory judgment is a matter we review de novo."); *Woodbridge Condo. Ass'n v. Lo Viento Blanco, LLC*, 2020 COA 34, ¶ 24 ("We review findings of fact for clear error, meaning that we won't disturb such findings if

there is any evidence in the record supporting them."), *aff'd*, 2021 CO 56.

¶ 42     C.R.C.P. 57, which governs declaratory judgments, is "remedial in nature and should be liberally construed to 'afford relief from uncertainty and insecurity with respect to rights, status, and other legal relations.'" *City of Boulder v. Pub. Serv. Co. of Colo.*, 2018 CO 59, ¶ 28 (quoting *Toncray v. Dolan*, 593 P.2d 956, 957 (Colo. 1979)); *see generally* §§ 13-51-101 to -115, C.R.S. 2025 (the Uniform Declaratory Judgments Law).  A court may fashion a remedy in proceedings where declaratory relief is sought and the judgment or decree will "terminate the controversy or remove an uncertainty." § 13-51-109, C.R.S. 2025.

¶ 43     When a jury decides factual issues incident to its resolution of claims related to a request for declaratory relief, a trial court "is bound by the jury's determination" where there are "essential factual issues that are central to both" the jury verdict and the declaratory judgment claim.  *Marquardt v. Perry*, 200 P.3d 1126, 1130-32 (Colo. App. 2008) (applying this concept in the context of a court's resolution of equitable contract claims after a jury trial on the legal claims).  "In determining this issue, we must analyze what

findings were actually made by the jury or were necessarily implicit in its verdict, and whether the trial court's subsequent findings and conclusions conflict with the jury's determination." *Id.* at 1132.

## B.    Analysis

¶ 44    After the jury returned its verdict, the trial court addressed the competing declaratory judgment claims and found that "the parties intended DISH to be able to use space beyond its exclusive 5' x 7' [area] for its door swings, without triggering [a]dditional [r]ent under the MLA so long as the door swings are reasonably placed on the 5' x 7' [area]."

¶ 45    Crown argues on appeal that if it prevails on either of its arguments with respect to the NEC workspace, reversal of the court's order on the door swings issue is required. But we have concluded that Crown's NEC workspace arguments fail, so this contention fails as well.

¶ 46    Crown also argues there was no controversy or uncertainty for the court to resolve through the entry of declaratory relief because it had previously dismissed its door swings claim. We disagree. As evidenced by Crown's continued pursuit of the issue on appeal, Crown's dismissal of the door swings claim did not resolve the

dispute. Rather, absent resolution through a declaratory judgment, DISH continued to face the prospect of future claims based on the door swings. The resolution of this uncertainty was clearly within the purpose of a declaratory judgment claim. *See* § 13-51-106, C.R.S. 2025; *Cmty. Tele-Commc'ns, Inc. v. Heather Corp.*, 677 P.2d 330, 334 (Colo. 1984) ("The purpose of this statute is to afford relief from the uncertainty surrounding legal rights and legal relations; it is remedial in nature and should be liberally construed and administered.").

¶ 47     Next, Crown argues that the trial court's declaratory judgment must be reversed because the court misconstrued the verdict and the evidence. It asserts that the trial court's conclusion — that "the jury verdict controls its determination with respect to the door swing[s]" — has no basis in fact because the claims resolved by the jury did not expressly address DISH's use of additional space when opening and closing its cabinet doors.

¶ 48     DISH disagrees, reasoning that the trial court properly entered a declaratory judgment in its favor because Crown cannot show that granting the motion was clear error. DISH also argues that the trial court properly ensured that Crown could not relitigate the door

swings controversy because the two claims (the door swings and whether Crown proved that DISH violated the MLA) were directly related.

¶ 49    We conclude that Crown's contentions misconstrue the full factual basis for the trial court's judgment on the door swings claim and ignore evidence that DISH presented in support of its position.

¶ 50    As Crown argues, the trial court did make clear its view that the jury's resolution of the NEC workspace claim was not limited to a particular configuration of DISH's equipment, as Crown had argued.  And the court stated that Crown had argued at trial that the NEC workspace and door swings needed to be within the 5' x 7' area.  Moreover, the court concluded that the jury rejected Crown's argument "when it specifically held that NEC working space did not need to be within the 5' x 7' [area]."  Similarly, the court concluded that, "consistent with the jury verdict and the evidence presented at trial, the parties intended DISH to be able to use space beyond its exclusive 5' x 7' [area] for its door swings without triggering additional rent under the MLA."  Thus, as Crown argues, the trial court's entry of declaratory relief on the door swings was based, in

25

part, on the jury's findings with respect to the NEC workspace issue.

¶ 51    But the trial court's declaratory judgment was not based solely on the jury's implied findings. To the contrary, as the court repeatedly made clear, it also independently reviewed the evidence and independently concluded that the parties contemplated that the door swings would not trigger additional rent. By way of illustration, the trial court stated as follows:

> As discussed below, *this [c]ourt finds that DISH is entitled to the requested relief on this claim: declaratory judgment in DISH's favor is required by the factual findings necessarily implicit in the jury's verdict and by this Court's factual findings based on the evidence presented at trial.*
>
> . . . .
>
> Thus, *consistent with the jury verdict and the evidence presented at trial, the [c]ourt finds* the parties intended DISH to be able to use space beyond its exclusive 5' x 7' [area] for its door swings without triggering [a]dditional [r]ent under the MLA so long as the door swings are reasonably placed on the 5' x 7' space.

(Emphases added.)

¶ 52    Between these statements, the court conducted an extensive independent review of the evidence. Among other things, the court

26

found that "Crown knew both before and at the time the parties signed the MLA that DISH's standard configuration required DISH's cabinet doors to extend beyond the 5' x 7' Lease Area when opened." And the court found that

> the intent of the parties when signing the MLA was that under the [monthly access fee (MAF)] "it would be the exception, not the rule, for DISH to get additional ground space at a site" because the MAF represented what Crown was going to charge DISH for [the SEC]. Requiring DISH to pay [a]dditional [r]ent for its door swings at virtually all Crown sites would be inconsistent with that intent.

¶ 53    As these findings illustrate, the court did not rely solely on the implied findings associated with the jury's verdict when concluding that the parties intended to permit DISH to open and close the equipment doors without triggering any additional rent. And though Crown presented contrary evidence in support of its interpretation of the parties' agreements, DISH also presented competent evidence to support its interpretation. Ultimately, the trial court — consistent with the jury's verdict — found DISH's evidence more persuasive. Thus, we discern no error in the trial court's entry of declaratory relief in favor of DISH on the door swings dispute.

## IV.    Disposition

The judgment is affirmed.

JUDGE J. JONES and JUDGE GROVE concur.