1
 2026 CO 25 United Services Automobile Association and State Farm Mutual Automobile Insurance Company, Petitioners v. Anthony Wenzell, Respondent No. 24SC372Supreme Court of Colorado, En BancApril 27, 2026
          
 Certiorari to the Colorado Court of Appeals Court of Appeals
 Case No. 23CA1327.
 
 2
 
          
 Attorneys for Petitioner United Services Automobile
 Association: Spencer Fane LLP Evan Stephenson Jeremy Moseley
 Denver, Colorado.
 
 
          
 Attorneys for Petitioner State Farm Mutual Automobile
 Insurance Company: Lehotsky Keller Cohn LLP Katherine C.
 Yarger Denver, Colorado Patterson Ripplinger, P.C. Franklin
 D. Patterson Karl A. Chambers Greenwood Village, Colorado.
 
 
          
 Attorneys for Respondent: Robert J. Anderson, P.C. Robert J.
 Anderson Scott F. Anderson Timothy G. Buxton Colorado
 Springs, Colorado Patrick Collins Esq. LLC L. Dan Rector
 Colorado Springs, Colorado
 
 3
 
          
 Attorneys for Amici Curiae Colorado Defense Lawyers
 Association and Colorado Civil Justice League: Wheeler Law,
 P.C. Karen H. Wheeler Jami A. Maul Jesse O. Brant Greenwood
 Village, Colorado
 
 
          
 Attorneys for Amicus Curiae Colorado Trial Lawyers
 Association: Western Slope Law Nelson A. Waneka Glenwood
 Springs, Colorado
 
 
          
 Attorneys for Amici Curiae National Association of Mutual
 Insurance Companies and American Property Casualty Insurance
 Association: Womble Bond Dickinson (US) LLP Kendra N.
 Beckwith Holly C. White Elizabeth Michaels Denver, Colorado
 
 
          
 Attorneys for Amicus Curiae Rocky Mountain Association of
 Public Insurance Adjusters: Burg Simpson Eldredge Hersh
 &Jardine, P.C. D. Dean Batchelder Patrick M. Sweet
 Englewood, Colorado
 
 4
 
          
 Attorneys for Amicus Curiae United Policyholders: Levin
 Sitcoff PC Gideon S. Irving Denver, Colorado.
 
 
          
 JUSTICE HOOD delivered the Opinion of the Court, in which
 CHIEF JUSTICE MARQUEZ, JUSTICE BOATRIGHT, JUSTICE GABRIEL,
 JUSTICE SAMOUR, and JUSTICE BLANCO joined. JUSTICE
 BERKENKOTTER dissented.
 
 
 
           HOOD,
 JUSTICE
 
 5
 
          ¶1
 In this insurance law case, we are confronted with two
 distinct issues.
 
 
          ¶2
 First, we are asked to construe the breadth of a new statute,
 section 10-3-1118, C.R.S. (2025) ("section 1118"),
 which proceduralizes how insurers may assert a common-law
 failure-to-cooperate defense. We reverse the conclusion below
 that the term "failure-to-cooperate defense," as
 used in section 1118, encompasses all insurer defenses based
 on any of a policyholder's contractual duties. Instead,
 we hold that the procedural requirements in section 1118
 apply only when the insurer's defense arises from a
 policy's general cooperation clause.
 
 
          ¶3
 Second, we are asked to determine when an excess
 underinsured-motorist ("UIM") insurer is required
 to begin its investigation and adjust a claim if the policy
 first requires the policyholder to exhaust all underlying
 insurance before claiming benefits. Because all UIM
 insurers-primary or excess-have a duty to pay their
 policyholders' undisputed claims for covered benefits, we
 affirm the division's conclusion and hold that if an
 excess UIM insurer includes an exhaustion clause in its
 policy, that clause is satisfied when a policyholder
 demonstrates undisputed damages that exceed the maximum
 limits of all the underlying policies.
 
 6
 
          I.
 Facts and Procedural History
 
 
          ¶4
 In 2017, Anthony Wenzell was rear-ended while driving.
 Unfortunately, it wasn't his first accident. He had been
 involved in a more serious crash in 2014 and required back
 surgery as part of his recovery.
 
 
          ¶5
 After the 2017 accident, Wenzell filed claims under three
 insurance policies: the tortfeasor's liability policy,
 Wenzell's policy with State Farm Mutual Automobile
 Insurance Company ("State Farm"), and a policy with
 United Services Automobile Association ("USAA")
 taken out by Wenzell's brother that covered family
 members. The State Farm policy and the USAA policy both
 included UIM insurance covering Wenzell, but the USAA policy
 also contained an excess "other insurance" clause.
 Wenzell claimed that all policies would be triggered because
 his damages would exceed the limits of the tortfeasor's
 liability policy and his own policy.
 
 
          ¶6
 After receiving Wenzell's claims, USAA and State Farm
 asked him on several occasions to release his medical records
 so they could apportion his damages between those
 attributable to the 2017 accident and those attributable to
 his prior injuries.[1] According to the insurers, Wenzell failed
 to comply with these
 
 7
 
 requests. More precisely, the insurers assert that he either
 didn't return the tendered medical release forms or
 offered deficient releases instead.
 
 
          ¶7
 In 2021, with his claims unresolved and the statute of
 limitations about to expire, Wenzell sued USAA and State Farm
 for breach of contract and for bad-faith delay or denial of
 insurance benefits.[2]
 
 
          ¶8
 During pretrial litigation, the court considered five motions
 for summary judgment or partial summary judgment and resolved
 all of them in the insurers' favor. Those motions
 centered around two issues. First, the trial court concluded
 that the insurers' defenses were based on Wenzell's
 failure to provide a comprehensive medical release, which was
 a condition precedent to compensation under the insurance
 policies. Therefore, after finding that there was no genuine
 issue of material fact regarding Wenzell's failure to do
 so, the court granted summary judgment in the insurers'
 favor on that issue without addressing section 1118. Second,
 the court concluded that Wenzell's bad-faith claim
 against USAA was improper because Wenzell hadn't
 exhausted his primary insurance
 
 8
 
 with State Farm. So, the trial court granted summary judgment
 in USAA's favor on that basis.[3] These decisions resulted in
 the complete dismissal of Wenzell's claims.
 
 
          ¶9
 Wenzell appealed, and a division of the court of appeals
 reversed the trial court's summary judgment orders in a
 published opinion. Wenzell v. United Servs. Auto.
 Ass'n, 2024 COA 40, ¶ 72, 552 P.3d 1121, 1133.
 The division concluded that section 1118's procedural
 requirements apply to all defenses when an insurer asserts
 that a policyholder failed to comply with a policy provision,
 not just those based in the general cooperation clause.
 Id. at ¶¶ 26-28, 552 P.3d at 1126-27.
 
 
          ¶10
 The division also decided that the trial court had erred by
 granting partial summary judgment in USAA's favor based
 on Wenzell's failure to exhaust his State Farm policy.
 Id. at ¶ 58, 552 P.3d at 1131. Applying the
 rationale from Tubbs v. Farmers Insurance Exchange,
 2015 COA 70, ¶ 18, 353 P.3d 924, 927, which was extended
 by Ligotti v. Allstate Fire &Casualty Insurance
 Co., 694 F.Supp.3d 1371, 1378 (D. Colo. 2023), the
 division reasoned that an insurer may not require an
 
 9
 
 insured to "exhaust" his primary insurance-meaning,
 the policyholder can't be required to receive a
 policy-limits payment from the primary insurer before the
 excess insurer adjusts his claim. Wenzell,
 ¶¶ 57-59, 552 P.3d at 1131. "[I]f it is
 determined that Wenzell is entitled to damages beyond the sum
 of the other driver's liability insurance and State
 Farm's UIM insurance (i.e., beyond $1.1 million), USAA
 will be required to pay the excess of Wenzell's damages
 up to its policy limit of $300,000" regardless of how
 much Wenzell ultimately receives from those other insurers.
 Id. at ¶ 59, 552 P.3d at 1131. In embracing
 this approach, the division concluded that excess UIM
 policies that require a policyholder to receive a
 policy-limits payment from the underlying insurer were void
 as against public policy. Id. at ¶ 57, 552 P.3d
 at 1131.
 
 
          ¶11
 Both insurers petitioned this court for certiorari review,
 and we granted both petitions.[4]
 
 10
 
          II.
 Analysis
 
 
          ¶12
 We begin by identifying the standard of review and familiar
 principles of statutory interpretation. We then apply those
 principles to section 1118 to assess the breadth of its
 procedural requirements. Lastly, we evaluate what
 "exhaustion" means in an excess UIM context and how
 a policyholder satisfies an exhaustion clause, and then we
 apply that rule to these facts.
 
 
          A.
 Standard of Review and Principles of Statutory
 Construction
 
 
          ¶13
 We interpret the insurance code de novo. Apodaca v.
 Allstate Ins. Co., 255 P.3d 1099, 1103 (Colo. 2011). We
 also review de novo the meaning of insurance contracts and
 whether insurance policy provisions are contrary to public
 policy. Bailey v. Lincoln Gen. Ins. Co., 255 P.3d
 1039, 1045, 1049 (Colo. 2011).
 
 11
 
          ¶14
 When interpreting statutes, our primary task is to give
 effect to the intent of the General Assembly. Skillett v.
 Allstate Fire &Cas. Ins. Co., 2022 CO 12, ¶ 9,
 505 P.3d 664, 666. We begin with the statute's plain
 language. Id. If it's unambiguous, we look no
 further. Id. However, if the statute is
 ambiguous-meaning susceptible to multiple reasonable
 interpretations -we may turn to extrinsic aids like
 legislative history or common-law analogues. § 2-4-203,
 C.R.S. (2025).
 
 
          ¶15
 And because the General Assembly "is presumed to be
 aware of existing" common-law precedent, Vigil v.
 Franklin, 103 P.3d 322, 327 (Colo. 2004), when the
 General Assembly tills a new statutory field and uses a
 common-law term, the "old soil" comes with it,
 United States v. Hansen, 599 U.S. 762, 778 (2023).
 We won't assume legislation abrogates the common law
 unless the legislature clearly expresses its intent to do so.
 Beach v. Beach, 74 P.3d 1, 4 (Colo. 2003).
 
 
          B.
 The Scope of Section 1118's Procedural
 Requirements
 
 
          ¶16
 The insurers responded to Wenzell's complaint by
 asserting that his claims were barred because his failure to
 provide sufficient medical releases constituted a failure to
 satisfy a condition precedent in his insurance contracts.
 Wenzell countered that the insurers' reliance on the
 medical release requirement was really just a camouflaged
 failure-to-cooperate defense, and because the insurers
 hadn't
 
 12
 
 complied with section 1118 before asserting that defense, he
 contends they were precluded from relying on the unsigned
 medical releases to deny coverage.
 
 
          ¶17
 To assess whether section 1118 governs both the affirmative
 defense of failure-to-cooperate-based on the general
 cooperation clause-as well as other common-law defenses based
 on the failure to satisfy contractual conditions
 precedent-like Wenzell's failure to provide the requested
 medical releases-we must first determine the breadth of the
 common-law failure-to-cooperate defense and whether the
 enactment of section 1118 abrogated the common-law rule.
 
 
          1. Does
 the Common-Law Failure-to-Cooperate Defense Include the
 Common-Law Failure-to-Satisfy-Conditions-Precedent Defense?
 
 
          ¶18
 Under the common law of insurance, policyholders have a duty
 to cooperate with their insurer to support the investigation,
 adjustment of claims, and any litigation undertaken by the
 insurer to compensate the policyholder. State Farm Mut.
 Auto. Ins. Co. v. Brekke, 105 P.3d 177, 189 (Colo.
 2004). The scope of the duty is usually defined by the
 insurer in the policy. Id. And in litigation between
 a policyholder and the insurer, the latter may defend its
 refusal to pay benefits by asserting that the
 policyholder's failure to comply with the cooperation
 clause in the policy prevented the insurer from properly
 investigating the claim. See Soicher v. State Farm Mut.
 Auto. Ins. Co., 2015 COA 46, ¶ 19, 351 P.3d 559,
 564.
 
 13
 
          ¶19
 In discussing this common-law defense, we have distinguished
 between general "duties of cooperation" as opposed
 to the conditions precedent for performance under the
 contract, which are "an additional list of duties . . .
 designed to assure that [the insurer] had all the information
 about the nature of the U[I]M claim." Brekke,
 105 P.3d at 189. Divisions of the court of appeals have
 followed suit. See, e.g., State Farm Mut. Auto.
 Ins. Co. v. Goddard, 2021 COA 15, ¶¶ 44-46,
 484 P.3d 765, 775 (quoting the insurance policy's
 cooperation clause in full to demonstrate that cooperation is
 defined by the terms of the contract and is distinct from
 other enumerated duties in the contract); Soicher,
 ¶¶ 25-27, 351 P.3d at 565 (distinguishing the
 policyholder's duty of good faith from their duty to
 cooperate under the terms of the contract).
 
 
          ¶20
 In sum, there is a distinction between a policyholder's
 common-law duty to cooperate and a policyholder's duty to
 satisfy the conditions precedent in the contract. See
 Ahmadi v. Allstate Ins. Co., 22 P.3d 576, 579 (Colo.App.
 2001). This distinction also affects how these duties are
 pled. For instance, unlike in a breach-of-contract defense
 related to a condition precedent, to succeed on a
 failure-to-cooperate defense, the insurer must show that the
 policyholder's failure to cooperate "materially and
 substantially disadvantaged the insurer."
 Soicher, ¶ 19, 351 P.3d at 564; see
 also 1 Allan D. Windt, Insurance Claims
 &Disputes: Representation of Insurance Companies
 &Insureds § 3:2, Westlaw (6th ed. database
 updated May
 
 14
 
 2025) (addressing an insured's duty to cooperate). This
 requires the insurer to prove actual prejudice from the
 insured's failure to cooperate, a showing not required to
 succeed on a failure-to-satisfy-condition-precedent defense.
 
 
          ¶21
 This distinction regarding conditions precedent has some
 intuitive force. Policyholders are on notice of the
 enumerated conditions precedent in their policies requiring
 them to engage in specific conduct-like the duty to provide a
 comprehensive medical release-without additional notice from
 the insurer. But a generic duty to cooperate could include a
 range of unspecified conduct that a policyholder might not
 realize the insurer expects them to perform.
 
 
          ¶22
 Because advocates for policyholders believed that
 policy-defined general cooperation clauses could lead to
 gamesmanship in litigation by insurers, the General Assembly
 passed H.B. 20-1290, which would become section 1118.
 See Hearing on H.B. 1290 before the H. Judiciary
 Comm., 72d Gen. Assemb., 2d Reg. Sess. (Mar. 10, 2020)
 (Chairman, Representative Mike Weissman, stating, "So in
 the law as we have it now, are there no guardrails on when or
 how this defense may be raised?"); see also Ch.
 229, sec. 1, § 10-3-1118, 2020 Colo. Sess. Laws 1116,
 1116-17.
 
 
          2.
 Did the Passage of Section 1118 Abrogate the CommonLaw
 Failure-to-Cooperate Defense?
 
 
          ¶23
 Section 1118 imposes mandatory procedures that an insurer
 must follow before it may advance a failure-to-cooperate
 defense. § 10-3-1118(1). Under the
 
 15
 
 statute, to assert a failure-to-cooperate defense, an insurer
 must give the policyholder written notice of his or her
 failure to cooperate within sixty days of the alleged
 failure, and the notice must provide the policyholder with
 sixty days to cure. § 10-3-1118(1)(e)(I)-(II).
 Specifically, an insurer must inform the policyholder that it
 is seeking information that is unavailable without the help
 of the insured and may only seek information that a
 reasonable person would determine is needed to adjust the
 claim or to prevent fraud. § 10-3-1118(1)(b), (d).
 ¶24 Although the statute refers to an insurer's
 "failure-to-cooperate defense," §
 10-3-1118(1), and the policyholder's underlying
 "duty to cooperate," § 10-3-1118(3), it
 doesn't define the word "cooperate."
 
 
          ¶25
 Therefore, we turn to the dictionary. Cowen v.
 People, 2018 CO 96, ¶ 14, 431 P.3d 215, 218
 (endorsing common-use dictionaries as a useful source to give
 meaning to undefined statutory terms). One common
 understanding of "cooperate" is "to act or
 work with another" or to "act together or in
 compliance." Cooperate, Merriam-Webster
 Dictionary, https://www.merriam-webster.com/
 dictionary/cooperate [https://perma.cc/2ESQ-JZSA]. But in
 insurance contracts, it's common for the policy to assign
 a narrower meaning to "cooperate" under the terms
 of the contract. See Brekke, 105 P.3d at 189.
 Section 1118's use of "cooperate" is equally
 susceptible to at least two meanings: (1) a colloquial
 meaning consistent with the foregoing dictionary definition
 or (2) a technical meaning that limits
 
 16
 
 "cooperation" to the definition in the insurance
 policy (or by courts interpreting that policy). Therefore,
 the statutory text is ambiguous. The statutory term
 "cooperate" could refer to a policyholder's
 general duty to cooperate, or it could also include
 compliance with any specifically enumerated conditions
 precedent. Because these are distinguishable concepts at
 common law, we turn to the legislative history for guidance.
 
 
          ¶26
 We presume the General Assembly is aware of our precedent.
 Vigil, 103 P.3d at 327. Often, we do so without the
 legislature explicitly demonstrating such awareness. Not so
 here. When the bill that became section 1118 was in
 committee, the members who voted on the bill debated the
 meaning of cooperation with reference to the common-law
 background. Even so, whether the committee intended to modify
 common-law strictures is unclear. Representative Alec Garnett
 suggested that the bill was intended to provide a standard
 meaning for cooperation. He found it problematic that
 "[w]hat constitutes . . . noncooperation is largely
 undefined and is subject to the discretion of individual
 insurance companies. For example, failure to cooperate can
 include . . . failing to sign a specific form, or refusing to
 turn over private or irrelevant information." Hearing on
 H.B. 1290 before the H. Judiciary Comm., 72d Gen. Assemb., 2d
 Reg. Sess. (Mar. 10, 2020) (statement of Rep. Garnett). He
 suggested that a uniform definition would "provide
 clarity because of the near limitless assertions . . . an
 
 17
 
 insurance company can make and then use to accuse
 policyholders of failing to cooperate." Id. In
 isolation, his statement may suggest that he intended to
 abrogate the common-law approach.
 
 
          ¶27
 But it's unclear whether a majority of the committee
 shared Representative Garnett's desire. Representative
 Adrienne Benavidez, for example, implied that the terms of an
 insurance contract would continue to control what constitutes
 cooperation in a particular instance. Id. (statement
 of Rep. Benavidez). She noted that if a policy defined
 cooperate, "that's defining-if you're telling
 one of your insured, you need to cooperate by submitting this
 and I'm asking you to do this because your policy says
 you have to do this, that's pretty clear."
 Id. Her statement suggests that she was comfortable
 allowing policies to define cooperation rather than imposing
 a legislative definition.
 
 
          ¶28
 Without a clear expression of the General Assembly's
 specific intent to modify the common-law duty to cooperate,
 we conclude that section 1118 didn't abrogate the common
 law. Beach, 74 P.3d at 4. Thus, the
 failure-to-cooperate defense remains distinct from
 condition-precedent defenses, and only the former is subject
 to section 1118's procedure.[5]
 
 18
 
          ¶29
 In the case before us, USAA and State Farm asserted that
 Wenzell had failed to provide a suitable medical release,
 which if true, is a breach of the enumerated conditions
 precedent in the policies, not the policies' general
 cooperation clauses. Accordingly, section 1118's
 requirements don't apply, and we reverse the
 division's conclusion on this issue.
 
 
          ¶30
 Having resolved the statutory issue, we turn to the
 interpretation of USAA's exhaustion clause.
 
 
          C.
 Exhaustion Provisions in the Excess UIM Insurer
 Context
 
 
          ¶31
 In Colorado, all drivers on public roadways must maintain
 liability coverage that complies with statutory minimums.
 § 10-4-620, C.R.S. (2025). Insurers are also required to
 offer UIM coverage as part of a liability policy, although
 this coverage may be declined by policyholders. §
 10-4-609(1)(a)(I)-(II), C.R.S. (2025). In addition, a
 policyholder may have more than one UIM policy, and insurers
 are permitted to include provisions that clarify which
 insurer's coverage will apply first if a policyholder has
 multiple policies that might cover the same loss. Shelter
 Mut. Ins. Co. v. Mid-Century Ins. Co., 246 P.3d 651, 660
 (Colo. 2011). Here, the USAA policy stipulated that any
 coverage for "[a] vehicle [Wenzell's brother] do[es]
 not own . . . will be excess over any collectible
 insurance," making the USAA policy excess over State
 Farm's primary UIM coverage of Wenzell.
 
 19
 
          ¶32
 Because it was an excess insurer on this claim, USAA argued
 that it wasn't obligated to pay UIM benefits until State
 Farm (Wenzell's primary insurer) paid Wenzell the
 policy-limits amount. Because Wenzell hadn't collected up
 to the limits of his primary coverage with State Farm, USAA
 maintained that its coverage wasn't triggered.
 
 
          ¶33
 The division rejected USAA's argument because it
 concluded that if an insurer, through an exhaustion clause in
 the policy, conditions excess coverage on the primary insurer
 making a coverage-limits payment, then the clause is
 unenforceable under Colorado law and public policy.
 Wenzell, ¶ 57, 552 P.3d at 1131. Instead, the
 division determined that an excess UIM policy is triggered
 when the policyholder claims damages exceeding the maximum
 policy limits of all the underlying policies. Id. at
 ¶¶ 58-59, 552 P.3d at 1131. We agree with the
 division, but we clarify that Colorado law permits the
 enforcement of exhaustion clauses in the excess UIM context
 only if exhaustion is based on a policyholder's
 undisputed damages rather than payment by the primary
 insurer.
 
 
          1.
 What Constitutes Exhaustion of an Underlying UIM
 Policy
 
 
          ¶34
 We begin by assuming, without deciding, that the USAA policy
 provision stating that the policy is "excess over any
 collectible insurance" is an exhaustion clause. We have
 never defined what it means for underlying insurance to be
 "exhausted" in the context of excess UIM coverage.
 While the concept has been
 
 20
 
 raised in prior decisions, those cases didn't concern UIM
 coverage, which is subject to additional statutory
 regulation, e.g., § 10-4-609, and didn't
 require us to define the term. See Apodaca, 255 P.3d
 at 1103; Pub. Serv. Co. of Colo. v. Wallis
 &Cos., 986 P.2d 924, 941 (Colo. 1999).
 
 
          ¶35
 Other jurisdictions have analyzed similar exhaustion
 clauses, and two general paths emerge: the policyholder
 exhausts underlying insurance when (1) it is determined that
 his damages will exceed the underlying limits-the
 undisputed-damages approach, e.g., Waste Mgmt.
 of Minn., Inc. v. Transcon. Ins. Co., 502 F.3d 769, 774
 (8th Cir. 2007); or (2) the primary insurer has tendered
 payment up to its limits-the payment-limit approach,
 e.g., Citigroup Inc. v. Fed. Ins. Co., 649
 F.3d 367, 373 (5th Cir. 2011). USAA proposes we adopt the
 payment-limit approach.
 
 
          ¶36
 But at least one federal court applying Colorado law in an
 excess UIM coverage context adopted the undisputed-damages
 approach. Ligotti, 694 F.Supp.3d at 1378 ("[The
 primary insurer's] payment does not offset [the excess
 insurer's] liability; [the excess insurer] is responsible
 for damages exceeding the limit of the [primary] [p]olicy no
 matter what amount [the primary insurer] pays."). The
 Ligotti court reasoned that if a primary UIM carrier
 may not use an exhaustion clause to avoid covering damages
 beyond the tortfeasor's liability limit, then by the same
 logic, an excess UIM carrier may not use its exhaustion
 clause to avoid
 
 21
 
 covering damages beyond the primary UIM carrier's limit.
 Id. This logic is indicative of the
 undisputed-damages approach because the primary determinant
 of coverage is the policyholder's damages, not the
 primary insurer's payment. While we aren't bound by a
 federal court's reasoning, we embrace that approach as
 consistent with Colorado law and policy for several reasons.
 
 
          ¶37
 First, although Colorado seeks "to provide
 insurers and insureds the freedom to contract,"
 Bailey, 255 P.3d at 1046, that freedom isn't
 limitless. We will invalidate a clause in an insurance
 contract if its enforcement would "dilute, condition, or
 limit statutorily mandated coverage." Meyer v. State
 Farm Mut. Auto. Ins. Co., 689 P.2d 585, 589 (Colo.
 1984), superseded on other grounds by statute,
 § 10-4-418(2)(b), C.R.S. (2025), as recognized in,
 Schlessinger v. Schlessinger ex rel. Schlessinger, 796
 P.2d 1385, 1389 (Colo. 1990). Adopting the payment-limit
 approach, as USAA proposes, would limit coverage by
 conditioning an excess insurer's payment on the primary
 insurer's adjustment and payment of the claim. Under our
 decision in Meyer, that type of conditioned coverage
 is contrary to Colorado law. Meyer, 689 P.2d at 589;
 see also Jordan v. Safeco Ins. Co. of Am., Inc.,
 2013 COA 47, ¶ 29, 348 P.3d 443, 449; cf.
 Ligotti, 694 F.Supp.3d at 1378 (rejecting insurers'
 attempts to condition coverage on a policy-limits payment to
 an insurer at a lower level of coverage).
 
 22
 
          ¶38
 Second, the undisputed-damages approach harmonizes
 the entire statutory UIM scheme by ensuring that primary and
 excess UIM insurers are equally prevented from using setoffs
 tied to payments from underlying coverage to artificially
 reduce their own coverage. Section 10-4-609(1)(c) provides
 that insurers shall not reduce coverage by a setoff from
 "other uninsured or underinsured motor vehicle
 insurance," which implies that the statute applies to
 excess UIM coverage that fits into that category. See
 Ligotti, 694 F.Supp.3d at 1377-78. As the
 Ligotti court explained, this means that while an
 excess insurer doesn't have to cover damages below the
 limits of the underlying policies, it also may not limit its
 liability by reference to payments made by underlying
 policies. Id.
 
 
          ¶39
 Lastly, we are not persuaded that the
 undisputed-damages approach will lead to phony, inflated
 pleadings intended to satisfy exhaustion and trigger excess
 policies that would otherwise go untouched. Under
 Colorado's statutory bad-faith regime, an insurer is only
 subject to statutory liability if it delays payment of
 undisputed damages covered by the insurance
 contract. See State Farm Mut. Auto. Ins. Co. v.
 Fisher, 2018 CO 39, ¶¶ 21-22, 418 P.3d 501,
 505. Policyholders must still demonstrate that their
 undisputed damages exceed the limits of all
 underlying policies to trigger an excess policy. Only a
 refusal or delay in paying such undisputed damages under a
 policy can give rise to a bad-faith claim against an
 
 23
 
 excess insurer. And should policyholders give their insurers
 the run-around to keep the informational dispute alive, the
 insurers retain their own tools-namely, the
 failure-to-cooperate defense we discussed in Part II.B.1
 above.
 
 
          2.
 Application
 
 
          ¶40
 Here, if Wenzell presents undisputed evidence that his
 damages would necessarily exceed all underlying policy
 limits-the tortfeasor's coverage and his primary UIM
 coverage with State Farm-then he will have exhausted
 "collectible" insurance, and USAA acts in bad faith
 if it doesn't investigate, adjust, and pay out undisputed
 portions of Wenzell's claim that exceed those limits.
 
 
          ¶41
 But the parties continue to dispute factual issues regarding
 Wenzell's medical release and the scope of his claimed
 damages. Wenzell claims that he has at least $2.7 million in
 medical costs traceable to the 2017 accident, but without a
 proper medical release and the opportunity to provide their
 own assessment of Wenzell's medical records, the insurers
 dispute whether these costs arise from the 2017 accident or
 from complications related to the 2014 accident. As long as
 that dispute persists, there are material issues of fact
 regarding whether USAA's coverage has been triggered.
 Therefore, USAA is not entitled to partial summary judgment
 based on the contract's exhaustion provision. See
 Westin Operator, LLC v. Groh, 2015 CO 25, ¶ 19, 347
 P.3d 606, 611 (noting that a movant is only entitled to
 summary judgment if there is no genuine dispute as to any
 material fact). USAA
 
 24
 
 has no obligation to investigate, adjust, or pay out
 Wenzell's claim until he presents undisputed evidence
 that his damages would necessarily exceed all underlying
 policy limits.
 
 
          III.
 Conclusion
 
 
          ¶42
 We reverse the judgment of the court of appeals in part,
 affirm in part, and remand the case to the division with
 directions to return it to the trial court.
 
 
          ¶43
 Specifically, we reverse the division's conclusions with
 respect to section 1118. On remand, consistent with this
 opinion, we direct the trial court to grant State Farm's
 and USAA's cross-motions for summary judgment based on
 Wenzell's failure to comply with the policies'
 enumerated conditions precedent. And because failure to
 comply with a condition precedent bars a policyholder from
 recovering under an insurance policy, Jensen v. Am. Fam.
 Mut. Ins. Co., 683 P.2d 1212, 1214 (Colo.App. 1984),
 Wenzell's remaining claims for bad-faith delay or denial
 of insurance benefits must likewise be dismissed.
 
 
          ¶44
 We also reverse the division's judgment that exhaustion
 clauses violate section 10-4-609(1)(c). Colorado law permits
 the enforcement of exhaustion clauses in the excess UIM
 coverage context but only when exhaustion is based on a
 policyholder's undisputed damages.
 
 
          ¶45
 Lastly, we affirm the division's judgment that USAA has
 an independent duty to evaluate Wenzell's claim. However,
 USAA's duty to investigate, adjust,
 
 25
 
 and pay out Wenzell's claim wouldn't arise until
 Wenzell could demonstrate that his undisputed damages exceed
 the limits of all underlying policies.
 
 
          
 JUSTICE BERKENKOTTER dissented.
 
 26
 
          
 JUSTICE BERKENKOTTER, dissenting.
 
 
          ¶46
 I agree with the majority regarding the plain and ordinary
 meaning of section 10-4-609(1)(c), C.R.S. (2025). I write
 separately because I don't agree with its interpretation
 of section 10-3-1118, C.R.S. (2025) ("section
 1118"), the failure-to-cooperate statute.[1] Section 1118 was
 intended to prevent an insurer from unfairly wielding
 failure-to-cooperate defenses against its insured in
 first-party insurance litigation. One way the statute
 accomplishes this is by requiring an insurer to notify its
 insured during the claims investigation process if
 the insurer believes that the insured hasn't provided
 information a reasonable person would conclude was necessary
 to adjust the insured's claim. Importantly, section 1118
 prevents the dismissal of an insured's claims based on
 alleged noncooperation if the defense is raised for the first
 time after litigation is filed.
 
 
          ¶47
 Just as important, the statute provides an insured with the
 opportunity to cure an alleged deficiency. If the insured
 cures the deficiency, the insurer receives the information it
 needs to adjust the claim; if not, the insurer may assert a
 failure-to-cooperate defense (if it is sued by its insured).
 What's more, by injecting a reasonable person standard
 into the analysis, section 1118 prevents courts from
 
 27
 
 dismissing claims based on minor or vague assertions that an
 insured failed to cooperate.
 
 
          ¶48
 How an insurer chooses to frame an alleged act of
 noncooperation-as arising from a general versus a specific
 duty to cooperate-once litigation has been filed months or
 years later is irrelevant to the inquiry section 1118
 requires. Because it is undisputed that the insurers here did
 not provide Anthony Wenzell with notice and an opportunity to
 cure, and because I agree with the majority's analysis
 regarding the plain and ordinary meaning of section
 10-4-609(1)(c), I would affirm the judgment of the court of
 appeals.
 
 
          ¶49
 The majority's analysis with respect to section 1118
 falls short for two reasons. First, it ignores the plain,
 unambiguous language of the statute, which does not
 distinguish between general and specific duties to cooperate.
 Second, a review of the statute's legislative history
 (assuming for the sake of argument that there's a reason
 to examine it) makes clear that the General Assembly intended
 the phrase failure-to-cooperate to apply broadly to prevent
 an insurer from unfairly using the defense against its
 insureds in first-party insurance litigation. Alleged
 gamesmanship by insurers concerning requests for blanket
 medical release authorizations-the type of noncooperation at
 issue here-was specifically mentioned by proponents of
 section 1118 no fewer than ten times during the
 
 28
 
 hearing in the House. Hearing on H.B. 1290 before the H.
 Judiciary Comm., 72d Gen. Assemb., 2d Reg. Sess. (Mar. 10,
 2020) (statement of Mark Levy).
 
 
          ¶50
 The majority's analysis turns the legislature's
 intent on its head. The absurd consequence of its opinion is
 that how an insurer chooses to label an insured's
 allegedly noncooperative conduct after the insurer
 is sued gives the insurer the power to determine whether
 section 1118 applies. That makes no sense. Section 1118 is
 intended to decrease potential gamesmanship, not increase it.
 It does this with respect to both insurers and insureds by
 recognizing insurers' legitimate interest in obtaining
 information reasonably necessary to adjust claims, while
 providing insureds specific notice and an opportunity to cure
 during the claims investigation process. By requiring notice
 about what specific information is still needed while a claim
 is being investigated, section 1118 demands that insurers put
 their cards on the table. If they are missing relevant
 information, the statute gives them a way to get it.
 
 
          ¶51
 Section 1118 also limits potential gamesmanship by insureds.
 It does this by allowing insurers to allege noncooperation as
 an affirmative defense if they follow the requirements of
 section 1118 and the insured still fails to cooperate. It
 also makes explicit that insurers will not be liable for a
 bad faith breach of contract claim solely because they give
 their insured the minimum amount of time to cure provided by
 the statute.
 
 29
 
          I.
 Additional Background
 
 
          ¶52
 Both State Farm Mutual Automobile Insurance Company's
 ("State Farm") and United Services Automobile
 Association's ("USAA") policies contained
 general cooperation clauses.[2] State Farm's policy provides
 that "[Wenzell] must cooperate with us and,
 when asked, assist us in . . . securing and giving
 evidence." (Emphasis in original.) Similarly, USAA's
 policy states that "[a] person . . . seeking any
 coverage or . . . payment of any benefits . . . must . . .
 [c]ooperate with us in the investigation . . . of any claim
 or suit."
 
 
          ¶53
 Other provisions in both policies require insureds to provide
 additional, more specifically identified information. State
 Farm's policy requires its insureds to "provide
 written authorization for [State Farm] to obtain: (a) medical
 bills[, and] (b) medical records." USAA's policy
 requires its insureds to "[a]uthorize [USAA] to obtain
 medical reports and other pertinent records."
 
 
          ¶54
 State Farm asked Wenzell to produce a list of medical
 providers and sign State Farm's medical records release
 authorization five times between September 2019 and July
 2021. Its release authorization sought expansive access to
 Wenzell's medical records. As presented, it would have
 allowed State Farm to obtain any
 
 30
 
 medical, psychological, psychiatric, or dental record, thus
 granting State Farm access to highly personal, privileged
 medical information. Such information could include notes
 from marital counseling sessions and records concerning
 treatment for sexual dysfunction and substance abuse (if they
 existed).
 
 
          ¶55
 USAA's medical records authorization request, like State
 Farm's, would have provided USAA sweeping access to a
 wide range of Wenzell's medical records, including any
 medical, psychological, psychiatric, dental, surgical, or
 other records that might exist. As with State Farm's
 medical records request, these requests could include
 potential documentation of drug use and mental health
 conditions. Neither these records nor the records concerning
 his prior accident were, in Wenzell's view, relevant to
 the injuries he alleged he had sustained in the 2017
 accident.
 
 
          ¶56
 Over time, Wenzell produced some, but not all, of the
 information that the insurers requested. It is undisputed
 that neither insurer provided him with notice of and an
 opportunity to cure any perceived failure-to-cooperate. Once
 Wenzell filed suit, however, both insurers moved for summary
 judgment, arguing that they were relieved from providing
 coverage because Wenzell had failed to cooperate with the
 terms of his insurance policies. The claimed deficiency:
 Wenzell failed to provide blanket medical record release
 authorizations.
 
 31
 
          ¶57
 With the stage set, I turn next to the law concerning
 failure-to-cooperate defenses.
 
 
          II.
 Analysis
 
 
          A.
 A Brief History of Failure-to-Cooperate Defenses Prior to the
 Passage of Section 1118
 
 
          ¶58
 This court has long recognized that an insurance policy may
 bind the insured to a duty to cooperate. Farmers Auto.
 Inter-Insurance Exch. v. Konugres, 202 P.2d 959, 962
 (Colo. 1949). When an insurer asserts a failure-to-cooperate
 defense, the insurer effectively argues that the insured has
 failed to comply with one or more provisions of the
 insured's policy. Soicher v. State Farm Mut. Auto.
 Ins. Co., 2015 COA 46, ¶ 25, 351 P.3d 559, 565
 (citing State Farm Mut. Auto. Ins. Co. v. Secrist,
 33 P.3d 1272, 1275 (Colo.App. 2001)). If the alleged
 noncooperation violates a specific policy provision in a way
 that "materially and substantially disadvantaged the
 insurer," the insurer may deny the insured's claim
 of coverage. Id. at ¶ 19, 351 P.3d at 564.
 
 
          ¶59
 Many Colorado attorneys and courts have taken a broad, not
 entirely consistent approach to describing and analyzing
 failure-to-cooperate defenses. Examples of these varied
 approaches are not hard to find in Colorado case law,
 including both published and unpublished cases involving
 medical records and medical releases. See, e.g.,
 Soicher, ¶¶ 17-30, 351 P.3d at 564-66
 (describing multiple approaches to characterizing the
 failure-to-cooperate defense). In State Farm Mutual
 Automobile Insurance Co. v. Goddard, 2021 COA 15, ¶
 45, 484 P.3d 765, 776, for instance, a division of the
 
 32
 
 court of appeals held that an insured's duty to cooperate
 arose from both a general cooperation clause and another
 specific provision. The court's analysis blended together
 the breach of the specific contractual clause and of the
 general cooperation clause. Id. at ¶ 46.
 
 
          ¶60
 The Tenth Circuit, applying Colorado law, took a different
 approach. It held that a failure to disclose future medical
 costs was noncooperation in part because compliance with a
 general cooperation clause constituted a condition precedent.
 Cribari v. Allstate Fire &Cas. Ins. Co., 861
 Fed.Appx. 693, 705 (10th Cir. 2021) (unpublished opinion). It
 also concluded that noncooperation could only occur where a
 party had also breached an explicit condition in the
 contract. Cribari, 861 Fed.Appx. at 704.
 
 
          ¶61
 A federal district court applying Colorado law took a similar
 approach in determining that an insured had breached his duty
 to cooperate by not providing necessary information.
 Polland v. State Farm Mut. Auto. Ins. Co., No.
 19-cv-01416-KLM, 2020 WL 6799934, at *2 (D. Colo. Nov. 19,
 2020). The court reasoned that the insured had breached his
 duty to cooperate because he was unambiguously bound by
 both a cooperation clause and an explicit provision
 in his insurance contract. Id. at *5.
 
 33
 
          ¶62
 In short, as proponents of the failure-to-cooperate statute
 noted, no one, not even the courts, knew exactly what
 "noncooperation" was. To alleviate this
 uncertainty, the General Assembly enacted section 1118.
 Wenzell v. United Servs. Auto. Assn, 2024 COA 40,
 ¶ 28, 552 P.3d 1121, 1126-27. The statute, which went
 into effect on September 14, 2020, applies to post-enactment
 litigation, like this case. See Ch. 229, secs. 1-2,
 § 10-3-1118, 2020 Colo. Sess. Laws 1116-17. It
 establishes specific ground rules for insurers asserting
 noncooperation as a defense. It requires that insurers
 provide insureds with written notice and an opportunity to
 cure before pleading and attempting to prove a
 failure-to-cooperate defense, according to the following
 requirements:
 
 
 (a) The insurer has submitted a written request to the
 insured or the insured's representative . . .;
 
 
 (b) The information is not available to the insurer without
 the assistance of the insured; (c) The written request
 provides the insured sixty days to respond;
 
 
 (d) The written request is for information a reasonable
 person would determine the insurer needs to adjust the claim
 filed by the insured or to prevent fraud; and
 
 
 (e) The insurer gives the insured an opportunity to cure ....
 
 
 § 10-3-1118(1).
 
 
          ¶63
 Against this backdrop, I turn to the insurers' arguments
 and the majority's opinion.
 
 34
 
          B.
 State Farm and the Majority Ignore the Plain Meaning of
 Section 1118
 
 
          ¶64
 State Farm argues that the phrase
 "failure-to-cooperate" has a specific meaning
 within the insurance industry.[3] It refers, State Farm asserts,
 only to those defenses arising from a breach of a general
 cooperation clause in an insurance policy. In State
 Farm's telling, Colorado law has long recognized a
 distinction between a general duty to cooperate
 based on a cooperation clause in an insurance policy and a
 specific duty to cooperate based on a more detailed
 provision in the same policy. Notably, an insurer may seek
 the dismissal of an insured's claims against it based on
 alleged noncooperation regardless of which type of clause is
 breached.
 
 
          ¶65
 State Farm's argument rests wholly on the premise that a
 failure-to-cooperate defense has a specific meaning in the
 insurance industry that Colorado courts have consistently
 recognized. Based on this premise, State Farm contends that
 section 1118(1)'s requirements do not apply here because
 it did not cite Wenzell's general duty to
 cooperate in its answer. Rather, it asserted an affirmative
 defense based on Wenzell's failure to comply with a
 condition
 
 35
 
 precedent, here, his specific duty to provide
 blanket medical authorizations. Thus, it concludes, the
 division's opinion must be reversed.
 
 
          ¶66
 The majority follows a somewhat different path to get to the
 same destination, though it too takes a wrong turn right out
 of the gate. See Maj. op. ¶ 19. Its misstep?
 Accepting State Farm's arguments that Colorado law has
 long recognized the specific meaning the insurance industry
 attributes to the phrase failure-to-cooperate and that
 attorneys and courts have always clearly distinguished
 between general and specific duties to cooperate. From there,
 the majority announces that section 1118 is ambiguous because
 it can't tell if the plain meaning of
 failure-to-cooperate or the insurance industry meaning
 applies. Id. at ¶ 25. Turning to legislative
 history, the majority ultimately and incorrectly concludes
 that the statute only applies to general duties to cooperate.
 Id. at ¶ 27.
 
 
          ¶67
 There are two major problems with the majority's
 reasoning in this regard. First and most notably, the plain
 language of section 1118 refers only to "a
 failure-to-cooperate defense." § 10-3-1118. The
 statute, which does not define "cooperation," does
 not explicitly limit its application to breaches of general
 cooperation clauses. See § 10-3-1118(1).
 Additionally, it does not distinguish between a duty to
 generally cooperate under an insurance contract and those
 duties to cooperate that arise under specific contractual
 provisions of the same policy. See id. There is thus
 no reason, based on the words used in the statute, to
 
 36
 
 conclude that it is adopting the nuanced, industry-specific
 distinction that the insurers claim exists. Disambiguation is
 not needed here.
 
 
          ¶68
 Moreover, because "[w]e do not add words to the statute
 or subtract words from it," Turbyne v. People,
 151 P.3d 563, 567 (Colo. 2007), we presume that the
 legislature deliberately chose its language, People v.
 Guenther, 740 P.2d 971, 976 (Colo. 1987). Had the
 legislature intended to distinguish between specific and
 general duties or limit the statute's procedural
 protections to defenses arising from only certain contractual
 clauses, it would have said so in the text.
 
 
          ¶69
 Second, a statute's enactment creates a presumption that
 it "to the extent possible . . . [is] written in plain,
 nontechnical language." § 2-2-801, C.R.S.
 (2025) (emphasis added). We presume that the words in a
 statute use a "common and everyday meaning."
 Id. This presumption may be overcome where a word
 has "acquired a technical or particular meaning."
 § 2-4-101, C.R.S. (2025). The majority overlooks these
 rules of statutory interpretation.
 
 
          ¶70
 As discussed previously, the way that attorneys and courts in
 Colorado use the phrase failure-to-cooperate is not
 particularly consistent. The many ways in which
 failure-to-cooperate defenses have been described undermines
 any claim that
 
 37
 
 the phrase failure-to-cooperate had a "technical or
 particular meaning." Id. Even so, the majority
 ignores our interpretative rules and in so doing creates,
 rather than avoids, an absurd result. See Archuleta v.
 Roane, 2024 CO 74, ¶ 9, 560 P.3d 399, 402 ("We
 should avoid interpretations that would lead to an absurd
 result.").
 
 
          ¶71
 Assuming, for a moment, that section 1118 is limited only to
 those failure-to-cooperate defenses that are based on an
 alleged breach of a general cooperation clause-what then?
 Insurers would be incentivized to create an
 ever-more-granular list of specific duties of cooperation to
 maximize their ability to assert a failure-to-cooperate
 defense without having to comply with section 1118. This
 would allow insurers to totally circumvent the statute's
 notice and cure requirements. Insurers would also be able to
 use the majority's opinion to cast the statute's
 reasonable person limit aside. In short, under the
 majority's reasoning, section 1118 will be rendered
 meaningless. Insureds will suffer the same uncertainties and
 dismissed claims that section 1118 was passed to alleviate.
 
 
          
 ¶72 To be sure, the insurers asked Wenzell to sign
 blanket medical release authorizations on multiple occasions.
 But neither insurer formally notified Wenzell in writing that
 he had sixty days to comply with specific reasonable requests
 for information or gave Wenzell a statutorily compliant
 opportunity to cure any particularized alleged failure. If
 the insurers had complied with section 1118 and notified
 Wenzell of the information they still reasonably needed to
 adjust his claim (perhaps information concerning the injuries
 he sustained in the 2014 accident and the treatment he
 received for those injuries), perhaps he
 
 38
 
 would have cured and the insurers would have received the
 information they needed. And if he hadn't, the insurers
 then could have fairly asserted that Wenzell failed to
 produce that information and sought to dismiss his claims.
 Instead, the parties seemed to be largely talking past one
 another, with no one ever stating what was reasonably needed
 to adjust Wenzell's claim.
 
 
          C.
 The Majority Ignores the Legislative History of Section
 1118
 
 
          ¶73
 Even assuming, for the sake of argument, that section 1118 is
 ambiguous, its legislative history reveals that the General
 Assembly intended the phrase failure-to-cooperate to apply
 broadly to protect insureds from having their claims unfairly
 dismissed by insurers. During the March 10, 2020, hearing
 before the House Judiciary Committee, the bill's sponsor,
 Representative Alec Garnett, spelled out what the bill aimed
 to address: concerns that insurers were unfairly using
 failure-to-cooperate defenses to get first-party insurance
 claims dismissed. Hearing on H.B. 1290, supra,
 (opening statement of Rep. Garnett). The bill was necessary,
 he said "to set conditions under which insurance
 companies can claim a failure to cooperate defense, and
 therefore, avoid payment of the covered benefits."
 Id. The bill's goal wasn't to eliminate the
 defense, but was needed because "[w]hat constitutes . .
 . noncooperation is largely undefined and is subject to the
 discretion of individual insurance companies."
 Id.
 
 39
 
          ¶74
 Critically, insurers were latching onto a broad range of even
 small acts of noncooperation to try to deny coverage. As
 Representative Garnett explained:
 
 
 Courts have struggled to provide clarity because of the near
 limitless assertions . . . an insurance company can make and
 then use to accuse policyholders of failing to cooperate. To
 make matters worse, failure to cooperate is a complete
 defense, meaning that even the smallest allegation can void
 an entire claim.
 
 
 Id.
 
 
          ¶75
 To illustrate his point, Representative Garnett cited
 specific examples of how failure-to-cooperate defenses were
 being unfairly deployed by insurers. His examples illustrate
 the kinds of failure-to-cooperate claims the bill aimed to
 address: the failure to respond to a letter, the failure to
 submit information on the correct form, the failure to sign a
 specific form, and, particularly pertinent here, the refusal
 to turn over private or irrelevant information. Id.
 Proponents of the bill cited additional examples, mentioning
 disputes concerning blanket medical release
 authorizations more than ten times. See, e.g.,
 id. (statement of Mark Levy). In sum, there is no
 question that the bill was intended to protect insureds from
 losing coverage over disputes concerning the very type of
 noncooperation at issue here. ¶76 Testimony by
 proponents also repeatedly emphasized the importance of
 giving insureds the opportunity to cure:
 
 
 So why we think the bill is necessary is because there needs
 to be some consistent standard before you take somebody's
 entire benefit away. I mean, that's the real damage here.
 And that it's being used as a club,
 
 40
 
 that after you file the lawsuit, for the first time ever,
 you're given notice of this alleged failure to cooperate.
 
 
 Id.
 
 
          ¶77
 Representative Garnett noted that the purpose of the bill was
 to "make sure that our policyholders aren't being
 caught up in a bunch of different ways to get their claims
 kicked out." Id. (closing statement of Rep.
 Garnett). The Committee's Chairman, Representative Mike
 Weissman, echoed that understanding: The bill intended to
 reach beyond litigation to address issues of failure to cure.
 Id. (statement of Rep. Weissman).
 
 
          ¶78
 Representative Garnett's statements regarding the
 bill's purpose and the proponents' testimony as to
 the problems the bill meant to address support a plain
 language reading of section 1118. There was no mention of an
 insurance industry definition of failure-to-cooperate
 defenses. See generally § 10-3-1118(1)
 (providing no specific definition for
 "cooperation"). What was mentioned-repeatedly-was
 insurers' alleged gamesmanship in the use of
 failure-to-cooperate defenses, the inconsistent judicial
 definition of failure-to-cooperate defenses, and how those
 circumstances adversely impacted insureds. See,
 e.g., Hearing on H.B. 1290, supra (closing
 statement of Rep. Garnett).
 
 
          ¶79
 There is no reasonable reading of the legislative history of
 section 1118 that suggests the legislature intended to carve
 out an exception for an insurance industry standard. Instead,
 section 1118's history reflects that the bill is about
 
 41
 
 fairness and creating a more level playing field.
 Id. (opening statement of Rep. Garnett and final
 statement of Rep. Adrienne Benavidez). The statute means what
 it says: If an insurer claims that the insured has failed to
 provide information that a reasonable person would conclude
 was necessary to adjust the insured's claim, the insurer
 must provide the insured notice and an opportunity cure.
 § 10-3-1118(1). That notice and opportunity must be
 provided while the claim is being investigated. It is
 undisputed that did not happen here.
 
 
          III.
 Conclusion
 
 
          ¶80
 Section 1118 is about fairness and leveling the playing
 field. Both the plain language of the statute and its
 legislative history reflect that the statute is intended to
 prevent an insurer from unfairly wielding noncooperation as a
 defense without first giving an insured notice and an
 opportunity to cure their claimed deficiency while the claim
 is being investigated. Regardless of how an insurer chooses
 to frame the insured's noncooperation in litigation years
 later, section 1118's requirements still apply. Because
 it is undisputed that the insurers here did not provide
 Wenzell with notice and an opportunity to cure and because I
 agree with the majority regarding the plain and ordinary
 meaning of section 10-4-609(1)(c), I would affirm the
 judgment of the court of appeals.
 
 
 ---------
 
 
 Notes:
 
 
 [1] The insurers argue they are entitled
 to a release under the terms of their policies. State
 Farm's policy provided, in part, that "[a]
 person making claim under . . . Uninsured Motor
 Vehicle Coverage . . . must . . . provide written
 authorization for us to obtain: (a) medical bills;
 (b) medical records; . . . and (d) any other information
 we deem necessary to substantiate the claim."
 And USAA's policy provided, in part, that "[a]
 person or entity seeking any coverage or payment of any
 benefits . . . must . . . [a]uthorize us to obtain
 medical reports and other pertinent records."
 
 
 [2] An apt observer may note that the
 statute that is at the center of one aspect of this dispute
 was enacted between the time of Wenzell's 2017 accident
 and the initiation of this lawsuit in 2021. However, the
 statute still applies because the General Assembly explicitly
 noted that section 1118 applied to "litigation that
 occurs on or after" the effective date of the act, which
 was September 14, 2020. Ch. 229, sec 2(2), § 10-3-1118,
 2020 Colo. Sess. Laws 1116, 1117.
 
 
 [3] The trial court also concluded that
 Wenzell's bad-faith claim against State Farm was improper
 because there was no genuine issue of material fact related
 to State Farm's conduct that would show unreasonable
 delay or denial of payment. Accordingly, it granted summary
 judgment in State Farm's favor on that basis. While the
 division reversed the trial court's ruling granting State
 Farm's motion for partial summary judgment on
 Wenzell's bad-faith delay or denial of insurance benefits
 claim, Wenzell v. United Servs. Auto. Ass'n,
 2024 COA 40, ¶ 70, 552 P.3d 1121, 1133, State Farm
 didn't raise this issue in its petition to this court,
 and we don't disturb the division's conclusion
 here.
 
 
 [4] We granted certiorari to review the
 following issues:
 
 
 1. Whether the restrictions from section 10-3-1118,
 C.R.S. (2024), which solely govern "a
 failure-to-cooperate defense" arising from an
 insured's failure to provide "the information the
 [first-party] insurer seeks," section 10-3-1118(1)(a),
 may extend to other, dissimilar defenses arising from neither
 (i) the insurance contract's cooperation provision nor
 (ii) an insurer's request for information directly from
 the insured.
 
 
 2. Whether the court of appeals' nullification of
 all exhaustion provisions in excess underinsured-motorist
 policies conflicts with this court's principle that
 underlying insurance "must first be exhausted"
 before excess insurance responds. Pub. Serv. Co. of
 Colorado v. Wallis &Cos., 986 P.2d 924, 941 (Colo.
 1999).
 
 
 3. Whether the court of appeals erred in conflating
 the specific contract duty to "provide written
 authorization for [petitioner] to obtain: (a) medical bills;
 (b) medical records; (c) wage, salary, and employment
 information; and (d) any other information we deem necessary
 to substantiate the claim," with the general duty to
 cooperate.
 
 
 Because Issues 1 and 3 overlap, this opinion addresses
 two analytical questions but is responsive to all three
 issues presented.
 
 
 [5] Our holding today should not be
 understood as an invitation to insurers to try to circumvent
 section 1118 by establishing novel or unduly onerous
 conditions precedent. Today's opinion leaves open the
 possibility that an insurer could still be subject to a
 statutory bad-faith claim if it uses conditions precedent in
 bad faith.
 
 
 [1] While section 1118 refers to the
 "failure-to-cooperate defense," much of the case
 law refers to the "noncooperation defense."
 See, e.g., Soicher v. State Farm Mut. Auto. Ins.
 Co., 2015 COA 46, ¶ 37, 351 P.3d 559, 567. I use
 the terms interchangeably.
 
 
 [2] Both State Farm and USAA raise
 similar, but not identical arguments regarding section
 1118's interpretation, legislative history, and intent.
 Where they overlap, I refer to them collectively as
 "insurers."
 
 
 [3] Interestingly, USAA did not argue that
 the failure-to-cooperate defense has a well-recognized
 meaning in the insurance industry.
 
 
 ---------